# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| LAURA A. HEIMLICHER and LAWRENCE W. HEIMLICHER, Individually, and as Administrators of the Estate of Cole C. Heimlicher, Deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>JAMES O. STEELE, M.D., and DICKINSON COUNTY MEMORIAL HOSPITAL, an Iowa non-profit corporation, *dba* LAKES REGIONAL HEALTHCARE,<br><br>Defendants. | No. C05-4054-PAZ<br><br>**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |

_____

## *I. BACKGROUND*

This action was commenced by the filing of a Complaint on June 14, 2005. The plaintiffs are Laura A. Heimlicher and Lawrence W. Heimlicher, both individually and as Administrators of the Estate of their deceased infant son, Cole C. Heimlicher. They are residents of Spirit Lake, Dickinson County, Iowa. The defendants are Dickinson County Memorial Hospital, Spirit Lake, Dickinson County, Iowa (the "Hospital"); and James O. Steele, M.D., a specialist in emergency medicine employed by the Hospital. Jurisdiction in this court is invoked under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and under the court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

According to the Complaint, on the evening of February 11, 2004, Laura Heimlicher, who was eight months pregnant, started to bleed vaginally. She called "911," but before the ambulance could arrive, her water broke. She was taken by ambulance to the Hospital, where she was admitted. She saw Dr. Steele in the Emergency

Department, and told him she had been bleeding severely since before her water broke, and she was suffering from severe pain in the abdominal wall surrounding her belly button.

Dr. Steele performed a vaginal examination, and found Laura Heimlicher's cervix to be 50% effaced. A fetal heart monitor was applied, and fetal heart tones were in the range of 120s to 130s, with good variability. Dr. Steele spoke with Dr. Fiegen, a doctor in Sioux Falls, South Dakota, who recommended administration of a medication. After the medication was administered, an ultrasound was completed by a technician employed by the Hospital. The technician assured Mrs. Heimlicher and Dr. Steele that there was no abruption, although she did identify an abnormality in the placenta. After again consulting with Dr. Fiegen, Dr. Steele decided it was safe to transfer Mrs. Heimlicher to Sioux Valley Hospital in Sioux Falls.

At about 10:25 p.m., Mrs. Heimlicher was taken by ambulance to the Sioux Falls, South Dakota, hospital. During the trip, her vaginal bleeding continued and her pain increased. Shortly before midnight, Mrs. Heimlicher arrived at Sioux Valley Hospital, where Dr. Fiegen noted she was in "severe pain and clearly abrupting her placenta or rupturing the uterus." She was taken to the operating room, where the baby was stillborn. Mrs. Heimlicher alleges she has suffered serious medical and psychological problems as a result of this incident.

In Count I of the Complaint, the plaintiffs seek to recover damages from the defendants for the wrongful death of Cole C. Heimlicher. In Count II, the plaintiffs allege as follows:

> 24. Defendant [Hospital] is and was a "participating hospital" as defined in 42 U.S.C. § 1395dd(e)(1).
>
> 25. Laura A. Heimlicher had an "emergency medical condition" as defined in 42 U.S.C. § 1395dd(e)(1). Dr. Steele, individually and as an agent of [the Hospital], was aware of Laura Heimlicher's emergency medical condition. Other employees and agents of [the Hospital] were aware of

2

> Laura Heimlicher's emergency medical condition. This awareness is documented in the "Consent for Transfer" form signed by Dr. Steele and Jennifer Helle.
>
> 26. Despite this knowledge of Mrs. Heimlicher's emergency medical condition, she was not "stabilized" as defined in 42 U.S.C. § 1395dd(e)[3](B).
>
> 27. Mrs. Heimlicher was "transferred" from the [Hospital] without being stabilized.
>
> 28. Dr. Steele and [the Hospital] violated the federal Emergency Medical Treatment and Active Labor Act ("EMTALA") by recognizing an emergency medical condition and failing to stabilize Mrs. Heimlicher to the extent that no material deterioration of her condition was likely, within reasonable medical probability, to result from her transfer from the hospital, and by transferring her to another facility without stabilizing her.
>
> 29. As a direct and proximate result of the failure of Dr. Steele and other employees and agents of [the Hospital] to stabilize Mrs. Heimlicher's emergency medical condition prior to transfer, Mrs. Heimlicher suffered "personal harm" to herself and her son. That personal harm caused or contributed to the death of Cole Heimlicher.
>
> FOR THESE REASONS, Plaintiffs Laura A. Heimlicher and Lawrence W. Heimlicher ask for judgment against the Defendants for a civil penalty in the amount of $50,000.00 as provided by 42 U.S.C. § 1395dd(d)[1], in addition to whatever other damages are available under Iowa State Law.

In Count III, the plaintiffs incorporate the allegations in Count I of the Complaint, and ask for parental consortium damages.

On July 18, 2005, Dr. Steele filed a motion to dismiss the Complaint. (Doc. No. 8) On July 3, 2006, the court entered an order (Doc. No. 20) granting the motion with respect to the plaintiffs' claims against Dr. Steele in Count II (the EMTALA claims), but denying the motion with respect to the state law claims against the doctor in Counts I

3

and III.  The court also dismissed *sua sponte* the plaintiffs' claim for a civil monetary penalty against the hospital under the EMTALA.  The court retained jurisdiction over the plaintiffs' claim for damages against the Hospital pursuant to the EMTALA, and retained supplemental jurisdiction over the state law claims in Counts I and III against both defendants.

On April 5, 2007, the defendants filed a joint motion for summary judgment (Doc. No. 26), seeking judgment on Count I of the Complaint.  In their motion, the defendants argued a stillborn infant is not entitled to assert a wrongful death claim under Iowa law.  The plaintiffs filed an untimely response to the motion on May 14, 2007.[1]  On May 15, 2007, the court directed the parties to file briefs addressing whether the court should certify to the Iowa Supreme Court the question of whether an unborn fetus has a cause of action for wrongful death under Iowa law.  The parties have submitted briefs on this question.  (Doc. Nos. 35, 36, & 37)

On April 5, 2007, the defendant Hospital filed a second motion for summary judgment (Doc. No 27), seeking judgment on the claims in Count II of the Complaint.  The Hospital argued it had complied with the requirements of the EMTALA before transferring Mrs. Heimlicher to Sioux Valley Hospital in Sioux Falls, South Dakota, and it therefore is entitled to summary judgment on these claims.  The plaintiffs have resisted this motion. (Doc. No. 32)

On August 16, 2007, the court held a status conference in this case at which Cameron Getto appeared on behalf of the plaintiffs, Joseph L. Fitzgibbons appeared on behalf of the Hospital, and Stephen J. Powell appeared on behalf Dr. Steele.  The parties elected to stand on their briefs as filed, and did not offer oral argument.  Accordingly, the

---

[1] On May 23, 2007, the defendant Hospital filed a motion to strike the plaintiff's response to the defendants' motion for summary judgment (Doc. No. 30) on the grounds that the resistance was untimely and did not comply with the Local Rules.  Dr. Steele joined in the motion.  (Doc. No 31).  Because the court finds the best approach to the issues raised in the motion for summary judgment is to deal with the merits of the motion, the motions to strike (Doc. Nos. 30 & 31) are **denied**.

4

motions for summary judgment and the question of certification to the Iowa Supreme Court are fully submitted to the court.

## II.  DISCUSSION

### A.  The Defendants' First Motion for Summary Judgment

*1.  Analysis*

The defendants argue that an unborn fetus is not a "person" entitled to bring a cause of action for wrongful death under Iowa law, *see* Iowa Code Section 611.20,[2] and they therefore are entitled to summary judgment on Count I of the Complaint. The plaintiffs do not really contend that Iowa law, as currently interpreted by the Iowa Supreme Court, would permit them to pursue such a claim. In fact, they acknowledge that Iowa law "restrict[s] recovery of nonviable as well as viable children," and "immunize[s] doctors for their negligence when it is their very action, or as in the present case, inaction that allows the fetus to be injured to the point where it is delivered as a stillborn." Doc. No 28-2, pp. 4-5. Instead, the plaintiffs argue the court should certify the question to the Iowa Supreme Court to consider whether the law should be changed.

The undersigned previously addressed a similar set of arguments in *Estate of Storm v. Northwest Iowa Hospital Corp.*, 2006 WL 3487620, slip op. (N.D. Iowa Dec. 4, 2006). In that case, the court observed as follows:

> Indeed, Iowa law seems to be well settled on the issue of whether a wrongful death action can lie for an unborn fetus. *See Dunn v. Rose Way, Inc.*, 333 N.W.2d 830 (Iowa 1983); *Weitl v. Moes*, 311 N.W.2d 259, 272-73 (Iowa 1981), *overruled on other grounds by Audubon-Exira Ready Mix, Inc. v. Ill. Cent. Gulf R.R.*, 335 N.W.2d 148, 152 (Iowa 1983). The court is bound by Iowa law in this diversity action. *Erie*

---

[2]"All causes of action shall survive and may be brought notwithstanding the death of the person entitled or liable to the same."  IOWA CODE § 611.20.

> *R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).

Despite this observations, the undersigned held in *Storm* that the following question should be certified to the Iowa Supreme Court:

> Does an unborn fetus have a cause of action for wrongful death under Iowa Code section 611.20?

This court's ruling in *Storm* was reversed by Judge Donald E. O'Brien on appeal.[3] The defendants argue the court should follow Judge O'Brien's reasoning in the present case. The plaintiffs argue the court should certify this issue to the Iowa Supreme Court. There is no question that if the court does not certify this issue to the Iowa Supreme Court, the court would have no alternative but to grant the defendants' motion for summary judgment on Count I.

*2. Certification*

The undersigned addressed the question of when it is appropriate to certify a question to the state court in *Bituminous Casualty Corp. v. Sand Livestock Systems, Inc.*, 2005 WL 1476441 (N.D. Iowa, June 22, 2005), as follows:

> "Whether a federal district court should certify a question of state law to the state's highest court is a matter 'committed to the discretion of the district court.'" *Leiberkneckt v. Bridgestone/Firestone, Inc.*, 980 F. Supp. 300, 309 (N.D. Iowa 1997) (quoting *Allstate Ins. Co. v. Steele*, 74 F.3d 878, 881-82 (8th Cir. 1996) (citing *Lehman Bros. v. Schein*, 416 U.S. 386, 391, 94 S. Ct. 1741, 1744, 40 L. Ed. 2d 215 (1974)); and citing *Packett v. Stenberg*, 969 F.2d 721, 726 (8th Cir. 1992) (also citing *Lehman Bros.*)).
>
> This court's Local Rules provide:

---

[3] Judge O'Brien held that "an unborn fetus does not have a cause of action under Iowa Code Section 611.20," and he declined to certify the question to the Iowa Supreme Court. *Estate of Storm v. Northwest Iowa Hosp. Corp.*, Case No. C06-4070-DEO, Doc. No. 37 (N.D. Iowa, March 7, 2007) (O'Brien, J.).

> When a question of state law may be determinative of a cause pending in this court and it appears there may be no controlling precedent in the decisions of the appellate courts of the state, any party may file a motion to certify the question to the highest appellate court of the state. The court may, on such motion or on its own motion, certify the question to the appropriate state court.

LR 83.1 (as amended Jan. 1, 2003). The Iowa Supreme Court is authorized by statute to answer questions certified by this court where the questions "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the appellate courts of [Iowa]." Iowa Code § 684A.1 (1996).

In *Leiberkneckt*, the Honorable Mark W. Bennett discussed in some detail the following factors to be considered in determining whether to certify a question to a state's highest court:

> (1) the extent to which the legal issue under consideration has been left unsettled by the state courts; (2) the availability of legal resources which would aid the court in coming to a conclusion on the legal issue; (3) the court's familiarity with the pertinent state law; (4) the time demands on the court's docket and the docket of the state supreme court; (5) the frequency that the legal issue in question is likely to recur; and (6) the age of the current litigation and the possible prejudice to the litigants which may result from certification. *Olympus Alum. Prod. v. Kehm Enters., Ltd.*, 930 F. Supp. 1295, 1309 n.10 (N.D. Iowa 1996) (citing *Rowson v. Kawasaki Heavy Indus., Ltd.*, 866 F. Supp. 1221, 1225 & n.5 (N.D. Iowa 1994)).

7

> *Leiberkneckt*, 980 F. Supp. at 310. The court added a seventh factor, to-wit: "whether there is any split of authority among those jurisdictions that have considered the issues presented in similar or analogous circumstances." *Id.*, 980 F. Supp. at 311.

*Bituminous Casualty* at *13-*14.

In *Storm*, the undersigned applied these standards and determined that certification was appropriate. The court found that three of the factors were neutral. Both this court and the Iowa Supreme Court had adequate legal resources to address the issue, both courts were familiar with the pertinent state law, and the time demands on both courts would be about the same. Two factors weighed in favor of certification. Because of recent developments in other areas of the law, the issue was likely to recur frequently. Also, the lawsuit in the *Storm* case had only been filed recently at the time of the ruling. The remaining two factors were related, but weighed in opposing directions. Under current Iowa law at the time, the issue under consideration was settled. An unborn fetus did not have a cause of action for wrongful death under Iowa Code section 611.20. This weighed heavily against certification. On the other hand, a marked split of authority existed among those jurisdictions that had considered the issue when presented with similar or analogous circumstances. This weighed in favor of certification.

The undersigned then reviewed the Iowa Supreme Court cases that relate to this issue. In *McKillip v. Zimmerman*, 191 N.W.2d 706 (Iowa 1971), a one-month pregnant woman miscarried after she was injured in an automobile accident. The Iowa Supreme Court noted that "[a] sharp division exists among the several states as to recovery for wrongful death of a stillborn viable fetus." *Id.*, 191 N.W.2d at 708. Although the fetus in *McKillip* was not viable, the court declined to decide the case on a viability theory. Instead, the court decided the issue as a matter of statutory construction. The court noted that without Iowa Code section 611.20, the administrator of an estate would have no cause of action for wrongful death. *Id*. The question, then, was whether a stillborn fetus is a

"person" on whose behalf a wrongful death action may be brought under section 622.20. *Id*. The court ruled as follows: "We hold 'person' as used in Code section 611.20 means only those born alive." *Id*., 191 N.W.2d at 709.[4]

In *Weitl v. Moes*, 311 N.W.2d 259, 272-73 (Iowa 1981), *overruled on other grounds, Audubon-Exira Ready Mix, Inc. v. Ill. Cent. Gulf R.R.*, 335 N.W.2d 148, 152 (Iowa 1983), the Iowa court applied its holding in *McKillip* to a viable, nearly-full-term fetus. Three justices dissented from this holding, asserting that a viable fetus should be considered a "person" under section 611.20. *Weitl*, 311 N.W.2d at 275-79. In *Dunn v. Rose Way, Inc.*, 333 N.W.2d 830 (Iowa 1983), the Iowa court reaffirmed its ruling in *Weitl*. *Dunn*, 333 N.W.2d at 831. Again, three justices dissented from the holding. *Id*., 333 N.W.2d at 835.

In *Storm*, the undersigned noted that the Iowa Supreme Court had not addressed the issue directly for more than twenty-three years, since its 1983 decision in *Dunn*. In 1987, the Iowa court decided *Craig v. IMT Insurance Co.*, 407 N.W.2d 584, 588 (Iowa 1987), holding an unborn child is a "covered person" under an insurance policy. In 2003, the Iowa court decided *In re Marriage of Witten*, 672 N.W.2d 768 (Iowa 2003), holding a frozen embryo is not a "child" for purposes of Iowa's child custody laws. The *Witten* court reviewed prior Iowa decisions regarding the rights of an unborn child, noting the decisions appeared to be contradictory. However, the court distinguished those decisions by explaining that each of them was decided on the basis of the particular statute in question, rather than on any overarching philosophical or legal distinction of an unborn fetus's rights. *See Witten*, 672 N.W.2d at 774-76.

In *Storm*, the undersigned then held that although the Iowa Supreme Court might decline to consider the issue anew, or having done so might reach the same result, the

---

[4] The *McKillip* court acknowledged that the federal court in Iowa had ruled otherwise in *Wendt v. Lillo*, 182 F. Supp. 56 (N.D. Iowa 1960), but the Iowa court declined to follow that authority. *McKillip v. Zimmerman*, 191 N.W.2d 706, 709 (Iowa 1971).

9

undersigned was reluctant to render a decision based upon historical precedents more than twenty years old. *See Keener v. Convergys Corp.*, 312 F.3d 1236, 1241 (11th Cir. 2002) ("'Where there is any doubt as to the application of state law, a federal court should certify the question to the state supreme court . . . to offer the state court the opportunity to interpret or change existing law.' *Mosher v. Speedstar Div. of AMCA Intern., Inc.*, 52 F.3d 913, 916-17 (11th Cir. 1995) (citation omitted)."); *Trans Coastal Roofing Co. v. David Boland, Inc.*, 309 F.3d 758, 761 (11th Cir. 2002) (same). The court noted that the treatment of the rights of an unborn fetus by courts throughout the United States has been intricate, confusing, and often contradictory. *See, e.g.*, 62A Am. Jur. 2d, *Prenatal Injuries: Wrongful Life, Birth, or Conception*, pt. III, *Actions for Prenatal Injuries to Decedent; Wrongful Death* (2006); 4 Modern Tort Law: Liability and Litigation § 31.8, *Prenatal Torts* (2d ed. 2006). *See also* Jason M. Steffens, *The "Peculiar" Being: The Rights of an Unborn Child in Iowa*, 88 Iowa L. Rev. 217 (Oct. 2002) (discussing inconsistencies in Iowa Supreme Court's holdings regarding the status of an unborn child). The court observed that a review of current case law, state law, and legal treatises indicated the current trend is to permit causes of action for the wrongful death of an unborn fetus in many cases.

The undersigned decided that the resolution of this state-law issue in Iowa should be left to the state. The court found the most prudent course of action would be to exercise the court's discretion and certify the question to the Iowa Supreme Court for determination. *See Leiberkneckt v. Bridgestone/Firestone, Inc.*, 980 F. Supp. 300, 309 (N.D. Iowa 1997) ("Whether a federal district court should certify a question of state law to the state's highest court is a matter 'committed to the discretion of the district court.'" (quoting *Allstate Ins. Co. v. Steele*, 74 F.3d 878, 881-82 (8th Cir. 1996) (citations omitted)).

10

Judge O'Brien ruled otherwise on appeal in *Storm*. He observed that the first factor identified by the *Leiberkneckt* court is the extent to which the legal issue under consideration has been left unsettled by the state courts. In *Storm*, as in the present case, the legal issue was whether the word "person" in Iowa Code section 611.20, the state's wrongful death statute, should be interpreted to include an unborn fetus. Under Iowa law, this is not an unsettled issue – a long line of authorities has established that an unborn fetus is not a person for purposes of the statute. Although these authorities have, over the years, been the subject of several dissenting opinions by the Iowa Supreme Court and have been criticized by other courts and legal writers, neither the Iowa Supreme Court nor the Iowa legislature has changed the law despite several opportunities to do so.

Obviously, this factor weighs heavily against certification. The issue is whether that ends the inquiry, or whether the other factors identified in *Leiberkneckt* can tip the balance in favor of certification despite the fact that the question sought to be certified is not unsettled under state law. Judge O'Brien found, in effect, that the first factor trumps the other certification factors; that is, where state law is currently settled, questions concerning the state law should not be certified to the state court, regardless of how the other factors are weighed. Judge O'Brien held, "This Court cannot agree . . . that the law is well settled, and then say to the Iowa Supreme Court, 'I know that, but I want you to change it anyway.'" *Storm*, No. C06-4070-DEO, Doc. No. 37, p. 30.

The defendants in the present case have provided the court with persuasive authorities that support Judge O'Brien's position on this question. *See* Doc. No. 35, p. 3 (citing *City of Houston v. Hill*, 482 U.S. 451, 471, 107 S. Ct. 2502, 2514, 96 L. Ed. 2d 398 (1987) ("It would be manifestly inappropriate to certify a question in a case where, as here, there is no uncertain question of state law whose resolution might affect the pending federal claim."); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79, 117 S. Ct. 1055, 1074-75, 137 L. Ed. 2d 170 (1997) ("Novel, unsettled questions of state law,

11

however, not 'unique circumstances,' are necessary before federal courts may avail themselves of state certification procedures."); *Tarr v. Manchester Ins. Corp.*, 544 F.2d 14, 15 (1st Cir.1976)[5] ("The purpose of certification is to ascertain what the state law is, not, when the state court has already said what it is, to afford a party an opportunity to persuade the court to say something else. The rule of *Erie RR. v. Tompkins*, 1938, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188, calls on us to apply state law, not, if we can be persuaded to doubt its soundness, to participate in an effort to change it.").

The court is persuaded by these authorities and holds that because the question of whether an unborn fetus is a "person" under the Iowa wrongful death statute is not unsettled, the court does not have the discretion to certify the question to the Iowa Supreme Court. Accordingly, the defendants' first motion for summary judgment (Doc. No. 26) is **granted** as to Count I of the Complaint.

### *B. The Hospital's Second Motion for Summary Judgment*

The Hospital argues it is entitled to summary judgment on Count II of the plaintiffs' Complaint, in which the plaintiffs seek damages from the Hospital pursuant to the EMTALA. The plaintiffs respond by arguing that their EMTALA claim against the Hospital presents genuine issues of material fact for trial. The standards for reviewing motions for summary judgment are well settled and will be applied by the court, although they will not be restated here.

The Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (commonly known as the "Anti-Patient Dumping" Act), was enacted into law in 1985. Section (a) of the Act provides:

---

[5]*Tarr* has been cited with approval by the Iowa Supreme Court. *See Foley v. Argosy Gaming Co.*, 688 N.W.2d 244, 248 (Iowa 2004).

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

Section (b) of the Act mandates that a hospital provide necessary stabilizing treatment for an individual who comes to the hospital if the hospital determines the individual has an emergency medical condition.

Title 42 U.S.C. § 1395dd(e) provides as follows with reference to pregnant women:

> (1) The term "emergency medical condition" means--
>> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
>>> (i) placing . . . the health of the woman or her unborn child [ ] in serious jeopardy . . .or
>>
>> (B) with respect to a pregnant woman who is having contractions--
>>> (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
>>> (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.
>
> * * *
>
> (3) (A) The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical

13

> condition described in paragraph (1)(B), to deliver (including the placenta).
> (B) The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

If an individual at a hospital has an emergency medical condition which has not been stabilized, the hospital may not transfer the individual unless (i) the individual is informed of the hospital's obligations under the Act and the risk of transfer, and "in writing requests transfer to another medical facility"; or (ii) a physician has signed a certification "that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer," and "the transfer is an appropriate transfer." 42 U.S.C. § 1395dd(c)(1)(A) and (B). An appropriate transfer is, in part, a transfer "in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child." 42 U.S.C. § 1395dd(c)(2)(A).

There is no dispute in this case that the Hospital is covered by the EMTALA, or that the Hospital was presented with an "emergency medical condition" when Laura Heimlicher came to the Hospital on February 11, 2004. There also is no dispute that Mrs. Heimlicher did not "in writing request[ ] transfer to another medical facility." She did, however, sign a "Consent For Transfer" form, which Dr. Steele also signed certifying that "[t]his patient with an emergency medical condition has been stabilized such that, within a reasonable degree of medical certainty, no material deterioration of this patient's

14

emergency medical condition is likely to result from or occur during transfer." Dr. Steele further certified on the form: "Based on the expected **benefits** of *delivery on c-section of premature fetus 34 weeks* and foreseeable **risks** of *more bleeding, painful contractions* to this patient, and based upon the information available to me at the time of this patient's transfer, I believe the medical benefits reasonably expected from the provision of appropriate medical treatment at another facility outweigh the increased risks to the patient's (and/or fetus') medical condition from effecting transfer." (Emphasis in original.)

In its second motion for summary judgment, the Hospital argues the undisputed facts establish that Mrs. Heimlicher was stabilized prior to transfer, and therefore, the Hospital cannot be held liable under the EMTALA.[6] The plaintiffs argue that although Dr. Steele signed the form certifying that Mrs. Heimlicher's emergency medical condition was stabilized before transfer, this certification was not true.

The court finds there are issues of material fact for the jury on the question of whether Mrs. Heimlicher was stabilized prior to transfer. It is true, as pointed out by the Hospital, that a determination of whether a patient is stable before being transferred must be made based on the patient's condition at the time of transfer, and not based on the eventual outcome of the condition. *See, e.g.*, *Morales v. Hospital Hermanos Meléndez*, 245 F. Supp. 2d 374, 379 (D.P.R. 2003) ("Liability under EMTALA is not determined based on the patient's condition after the release, but rather on whether the patient received the medical attention that any other patient in his position would have received.") In the present case, however, the question of whether the patient had been stabilized at the time of the transfer is in serious dispute.[7] Also, it appears the certification by Dr. Steele that

---

[6] To support these contentions, the Hospital cites medical evidence in the record and the opinion of its expert medical witness, Dr. Steve Tvedte.

[7] *See, e.g.*, Appendix E, affidavit of the plaintiffs' expert witness, Dr. Philip Leavy, Jr.

15

Mrs. Heimlicher's condition was stabilized prior to transfer may have been based on an incomplete understanding of the definition of "stabilized" in the EMALTA. There is substantial evidence in the record that Mrs. Heimlicher was having contractions while at the Hospital, so she could not have been "stabilized" for purposes of the EMTALA before delivery of the child and the placenta, *see* 42 U.S.C. § 1395dd(e)(3)(B), and delivery did not occur until after Mrs. Heimlicher was transferred to Sioux Valley Hospital. Under these facts, summary judgment based on the argument that Mrs. Heimlicher was stabilized prior to transfer is not appropriate.

The Hospital also points out that a pregnant woman who is having contractions and has not been stabilized can be transferred under the EMTALA if a physician signs a certification that, based upon the available information, the medical benefits reasonably expected from the transfer outweigh the increased risks to the mother and the unborn child. 42 U.S.C. § 1395dd(c)(1)(A). The Hospital argues that because Dr. Steele signed just such a certification, it is entitled to summary judgment on the plaintiffs' EMTALA claim. The Hospital cites no case authorities to support this argument.

The plaintiffs respond by arguing that the execution of a "Consent For Transfer" form does not provide an absolute defense to a claim for damages under the EMTALA. They also argue the form in this case was seriously deficient because on the form, the only identified "risks" were "more bleeding, painful contractions," and no mention was made of possible injury or death to the mother or fetus.

In *Vargas v. Del Puerto Hospital*, 98 F.3d 1202 (9th Cir. 1996), the Ninth Circuit Court of Appeals considered an appeal from a bench trial of an EMTALA claim. The plaintiff in that case, as here, argued that the certification was deficient because the certifying doctor failed to include an accurate summary of the benefits and risks. *Id.*, 98 F.3d at 1204. The court held as follows:

> The certification requirement is part of a statutory scheme with
> an overarching purpose of ensuring that patients . . . receive

16

> adequate emergency medical care. *Ejberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255 (9th Cir. 1995) (citing H.R. Rep. No. 241, 99th Cong., 1st Sess. (1986), *reprinted in* 1986 ISKCON 726-27). The purpose of the certification requirement in particular is to ensure that a signatory physician adequately deliberates and weighs the medical risks and medical benefits of transfer before effecting such a transfer.
>
> Congress surely did not intend to limit the inquiry as to whether this deliberation process in fact occurred to an examination of the transfer certificate itself. While such a contemporaneous record may be the best evidence of what a physician was thinking at the time, we cannot accept the proposition that the only logical inference to be drawn from the absence of a written summary of the risks is that the risks were not considered in the transfer decision. Other factors might account for the absence of such a summary, such as the time-pressure inherent in emergency room decision-making. Although a contemporaneous record is certainly preferable, we believe it would undermine congressional intent to foreclose consideration of other evidence surrounding the transfer decision. *See Romo v. Union Memorial Hosp., Inc.*, 878 F. Supp. 837, 844 (W.D.N.C. 1995) (absence of summary of risk and benefits on transfer certificate does not create EMTALA liability as a matter of law, but creates a jury question as to whether risk/benefit analysis was properly made by physician).

*Vargas*, 98 F.3d at 1205.

Thus, the *Vargas* court did not hold the hospital was entitled to prevail simply because the doctor signed the certificate. Instead, the court held the fact-finder was not limited to consideration of only the transfer certificate, but could consider other factors as well, and the ultimate question as to whether a proper risk/benefit analysis was made was an issue for the fact-finder at trial. *Cf. Romo v. Union Memorial Hosp., Inc.*, 878 F.Supp. 837, 844 (W.D.N.C.1995) (absence of summary of risk and benefits on transfer certificate

17

does not create EMTALA liability as a matter of law, but creates a jury question as to whether risk/benefit analysis was properly made by physician).

Whether Dr. Steele adequately deliberated and weighed the medical risks and benefits of transferring Mrs. Heimlicher from the Hospital to Sioux Valley Hospital in Sioux Falls, South Dakota, before signing the certificate is a question for the jury. The issue is not foreclosed by the fact that Dr. Steele signed the transfer certificate. Accordingly, the Hospital's motion for summary judgment on Count II (Doc. No. 27) is **denied**.

### *III. CONCLUSION*

For the reasons set forth above, the defendants' motion for summary judgment on Count I (Doc. No. 26) is **granted**, and Count I is dismissed. The Hospital's motion for summary judgment on Count II (Doc. No. 27) is **denied**. This case will proceed to trial on the plaintiffs' claim for damages against the Hospital in Count II, and against both defendants on Count III.

**IT IS SO ORDERED.**

**DATED** this 17th day of August, 2007.

*[signature: Paul A. Zoss]*

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT