*For Publication*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

LAURA A. HEIMLICHER and
LAWRENCE W. HEIMLICHER,

       Plaintiffs,

vs.

JAMES O. STEELE, M.D., and
DICKINSON COUNTY MEMORIAL
HOSPITAL, an Iowa non-profit
corporation, *dba* LAKES REGIONAL
HEALTHCARE,

       Defendants.

No. C05-4054-PAZ

**MEMORANDUM OPINION AND
ORDER ON DEFENDANTS'
POST-TRIAL MOTIONS**

_____

*I. BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II. DESCRIPTION OF ISSUES RAISED IN THE MOTIONS* . . . . . . . . . . . . 6

*III. STANDARDS FOR CONSIDERING POST-TRIAL MOTIONS* . . . . . . . . . 8
    *A.*   *Motions for Judgment as a Matter of Law* . . . . . . . . . . . . . . . . . . 8
    *B.*   *Motions for New Trial* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    *C.*   *Motions to Amend Judgment* . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*IV. ANALYSIS OF ISSUES RAISED IN THE MOTIONS* . . . . . . . . . . . . . . 13
    *A.*   *Does a Physician's Certification Absolve a Hospital from Liability
        under EMTALA for Transferring a Patient to Another Hospital?* . . 13
        *1.*   *Was Ms. Heimlicher's emergency medical condition stabilized
              before she was transferred to Sioux Valley Hospital?* . . . . . . 19
        *2.*   *Did Ms. Heimlicher make a written request to be
              transferred to Sioux Valley Hospital?* . . . . . . . . . . . . . . . 21
        *3.*   *Did Dr. Steele properly certify that the benefits from
              the transfer outweighed the risks?* . . . . . . . . . . . . . . . . . . 21
    *B.*   *Did the Court Err in Placing the Burden of Proof on the
        Certification Defense on Lakes Hospital?* . . . . . . . . . . . . . . . . . . 28

| | | |
|---|---|---|
| *C.* | *Did the Court Err in Instructing the Jury on Dr. Steele's Negligence?* | [30](#) |
| *D.* | *Did the Court Err in Instructing the Jury on Lakes Hospital's Negligence?* | [32](#) |
| *E.* | *Were the State-Law Negligence Claims against Lakes Hospital Preempted by EMTALA?* | [35](#) |
| *F.* | *Did the Court Err in Refusing to Submit Ms. Heimlicher's Comparative Fault to the Jury?* | [39](#) |
| *G.* | *Did the Court Mislead the Jury into Assigning Lakes Hospital Double Liability?* | [44](#) |
| *H.* | *Did the Court Err in Allowing Plaintiffs' Counsel to Ask Expert Witnesses Questions Based on the Jury Instructions?* | [47](#) |
| *I.* | *Did the Court Err in Permitting the Jury to Treat Dr. Low as an Agent of Lakes Hospital?* | [49](#) |
| *J.* | *Did the Court Erroneously Allow Evidence of Grief into The Record?* | [52](#) |
| *K.* | *Did the Court Err in Allowing Photographs of the Fetus into Evidence?* | [59](#) |
| *L.* | *Did the Court Err in Allowing Dr. Leavy to Testify to Matters Outside of His Expert Witness Designation?* | [62](#) |
| *M.* | *Did the Plaintiffs Waive Their EMTALA Claim by Not Submitting to the Court Timely Requested Jury Instructions on the Claim?* | [66](#) |
| *N.* | *Did the Court Err in Submitting Revised Damages Instructions to the Jury?* | [67](#) |
| *O.* | *Did the Court Err in Reading the Instructions to the Jury Before Any Evidence Was Received?* | [69](#) |
| *P.* | *Did the Court Err in Not Granting the Various Motions for Mistrial Asserted by the Defendants Throughout the Trial?* | [70](#) |
| *Q.* | *Was the Verdict Irrational, Arbitrary, Excessive, or Unjust?* | [76](#) |

| | |
|---|---|
| *V. CONCLUSION* | [85](#) |
| APPENDIX | [86](#) |
| DEFENDANTS' JOINT EXHIBIT H | [86](#) |
| PLAINTIFFS' EXHIBIT 5 | [87](#) |
| JOINT EXHIBIT 50, PAGE 15 | [88](#) |

INSTRUCTION NO.  13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

INSTRUCTION NO.  15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

INSTRUCTION NO.  16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

INSTRUCTION NO.  17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

INSTRUCTION NO.  18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

INSTRUCTION NO.  19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

INSTRUCTION NO.  20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

INSTRUCTION NO.  22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

## *I. BACKGROUND*

The plaintiffs in this case are Laura A. Heimlicher and Lawrence W. Heimlicher. The defendants are Dickinson County Memorial Hospital, a hospital in Spirit Lake, Iowa ("Lakes Hospital" or "the Hospital"); and James O. Steele, M.D., a specialist in emergency medicine working at Lakes Hospital.

On February 11, 2004, Ms. Heimlicher began experiencing vaginal bleeding, pain in her abdomen, and contractions. Joint Ex. 50, pp. 1-3. She was 34 weeks pregnant. She called "911" from her home, and was taken by ambulance to the Lakes Hospital emergency room, where she was examined by Dr. Steele. *Id.*, p. 6. He conducted a vaginal examination, and then ordered an ultrasound. *Id.*, p. 8. The ultrasound was performed by Tracy Evans, an ultrasound technician employed by Lakes Hospital. As Ms. Evans was performing the ultrasound examination, she described to Dr. Steele what she was seeing. Based on Ms. Evans's comments, Dr. Steele wrote in his notes that the ultrasound examination ruled out the possibility of a "placental abruption," a serious condition where the placental lining separates from the uterine wall. *Id.*, pp. 7-9. Dr. Steele made this notation even though he was not qualified to read ultrasound images,

3

and he knew Ms. Evans was not qualified to read ultrasound images. He also knew that an ultrasound examination could never rule out a placental abruption.[1]

No radiologist was available at Lakes Hospital to read the ultrasound images, so Ms. Evans transmitted the images electronically to "Dr. Low," a radiologist in Minnesota who was on call that night. Dr. Low and Ms. Evans then spoke on the telephone, and he told her his diagnosis was "mass vs. hemorrhage vs. fibroid." *See* Def. Joint Ex. H, the "ultrasound worksheet," a copy of which is attached to this ruling. Ms. Evans testified that she relayed this information to Dr. Steele. Dr. Steele testified he did not recall receiving this information, and he did not even know a radiologist had looked at the ultrasound images that evening. In fact, he testified he was not aware that Lakes Hospital had the capability of electronically sending ultrasound images to a radiologist for review. Dr. Steele testified that if he had been advised the images showed "mass vs. hemorrhage vs. fibroid," he would have ordered an immediate C-section.

Dr. Steele consulted by telephone with Dr. Michael M. Fiegen, an obstetrician in Sioux Falls, South Dakota, about Ms. Heimlicher's care and about transferring her to Dr. Fiegen's care at Sioux Valley Hospital in Sioux Falls. Sioux Valley Hospital is a larger hospital, with better facilities and a more specialized staff, about 100 miles away. Dr. Steele confirmed to Dr. Fiegen that Ms. Heimlicher's placenta was not abrupting and her uterus was not ruptured, and told him her condition was stable. Based on these representations, Dr. Fiegen agreed to accept the transfer. Dr. Fiegen had Dr. Steele administer medication to Ms. Heimlicher to slow her contractions.

The plaintiffs offered evidence that Dr. Steele failed to perform a proper differential diagnosis of Ms. Heimlicher's condition, and if he had done so, he would have diagnosed an abrupting placenta. There is no dispute that if Dr. Steele had known Ms. Heimlicher's

---

[1] Although an ultrasound test cannot rule out a placental abruption, in some cases it can confirm one. The plaintiffs' expert radiologist testified the ultrasound images taken on February 11, 2004, showed that Ms. Heimlicher's placenta was massively abrupting.

placenta was abrupting, the applicable standard of care would have required him to order an immediate C–section. There also is no dispute that the Lakes Hospital staff was capable of performing C–sections, and could have performed one that evening.

Inclement weather did not permit the use of a helicopter or an airplane, so Ms. Heimlicher was placed in a ground ambulance for transport to Sioux Valley Hospital. She was accompanied in the ambulance by Jennifer Helle, the nurse who had been caring for her at Lakes Hospital. After leaving Lakes Hospital in the ambulance, Ms. Heimlicher almost immediately began experiencing too-rapid contractions, profuse vaginal bleeding, and severe pain in her abdomen. At the same time, a fetal monitor was showing that the baby was in distress. Joint Ex. 50, p. 12. These symptoms were strong evidence of an abrupting placenta or a rupturing uterus. Nevertheless, Nurse Helle did not report the symptoms to Dr. Steele, or to anyone else, and the ambulance proceeded to Sioux Falls. Although there were hospitals capable of performing a C–section along the route to Sioux Falls, those options were not explored.

As the ambulance traveled to Sioux Falls, the baby's condition deteriorated significantly, and by the time the ambulance reached its destination, the baby's heartbeat was almost nonexistent. Dr. Fiegen determined that Ms. Heimlicher was in "severe pain and clearly abrupting her placenta or rupturing the uterus." An immediate C–section was performed, but the baby was stillborn. There is no dispute that the cause of death was a placental abruption, or that the baby likely could have been delivered without complications if a C–section had been performed at Lakes Hospital.

The plaintiffs claim the defendants were negligent in failing to recognize Ms. Heimlicher's need for an emergency delivery, and in transferring her to the Sioux Valley Hospital without first determining that her medical condition and the medical condition of the unborn child were not likely to deteriorate materially during the transfer. The plaintiffs also claim Lakes Hospital was liable under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, because Dr. Steele ordered

Ms. Heimlicher's transfer to Sioux Valley Hospital even though he knew she had an emergency medical condition that was not stabilized.

Trial commenced before a jury on March 2, 2009, and after eight days of trial, the case was submitted. The jury returned a verdict in favor of the plaintiffs and against both defendants on the plaintiffs' negligence claim, and against Lakes Hospital on the plaintiffs' EMTALA claims. The jury found Dr. Steele to be 30% at fault, and Lakes Hospital to be 70% at fault. The jury awarded Ms. Heimlicher damages of $307,800 against Dr. Steele and $718,200 against Lakes Hospital, and awarded Mr. Heimlicher damages of $205,200 against Dr. Steele and $478,800 against Lakes Hospital. The total amount of damages awarded to the plaintiffs was $1,710,000.

The defendants have filed five post-trial motions. Dr. Steele filed a motion for new trial and renewed motion for judgment as a matter of law, **Doc. No. 136**, and a motion to amend judgment, **Doc. No. 139**. Lakes Hospital filed a renewed motion for judgment as a matter of law, **Doc. No. 132**; a motion for new trial, **Doc. No. 133, § XIII**, joining in Dr. Steele's motion for new trial, and a motion to amend judgment, **Doc. No. 134**. Dr. Steele joined in Lakes Hospital's motion to amend judgment, **Doc. No. 137**. All of the defendants' motions have been resisted by the plaintiffs. **Doc. Nos. 142, 149, 150, 154, & 155**. The defendants filed reply briefs. **Doc. Nos. 156, 158**. The court held telephonic arguments on the motions on May 13, 2009, and the motions are now fully submitted.

## II. DESCRIPTION OF ISSUES RAISED IN THE MOTIONS

The defendants have raised a number of interrelated arguments in their various motions, and each defendant has joined in certain arguments raised by the other defendant. To address these arguments in an orderly manner, the court will break down the issues as follows:

**(A)**    Does a physician's certification under EMTALA absolve a hospital from liability under EMTALA for transferring a patient to another hospital? (Doc. No. 132, § II; Doc. No. 133, §§ I & III; Doc. No. 133-2, pp. 3-4; Doc. No. 158, pp. 2–4);

**(B)**    Did the court err in placing the burden of proof on the certification defense on Lakes Hospital? (Doc. No. 133–2, p. 4);

**(C)**    Did the court err in instructing the jury that Dr. Steele could be found negligent for transferring Ms. Heimlicher? (Doc. No. 136, § I, ¶ 2; Doc. No. 136-2, p. 5);

**(D)**    Did Lakes Hospital have a right or duty to diagnose or treat Ms. Heimlicher? (Doc. No. 133, § VI; Doc. No. 133–2, p. 3; Doc. No. 158, pp. 1–2);

**(E)**    Are common law claims against a hospital based on negligent transfer preempted by EMTALA? (Doc. No. 132, § III; Doc. No. 133, § II; Doc. No. 133–2, p. 4; Doc. No. 158, pp. 4–5);

**(F)**    Did the court err in not submitting Ms. Heimlicher's comparative fault to the jury? (Doc. No. 133, § IX(D); Doc. No. 133–2, p. 7; Doc. No. 136, § I, ¶ 3; Doc. No. 136–2, pp. 3–4; Doc. No. 156, ¶¶ 2–3);

**(G)**    Did the court, in giving Jury Instruction No. 17, mislead the jury into assigning Lakes Hospital double liability? (Doc. No. 158, pp. 1–2);

**(H)**    Did the court err in allowing plaintiffs' counsel to ask expert witnesses questions based on the jury instructions? (Doc. No. 133, § VIII; Doc. No. 133–2, pp. 5–6; Doc. No. 136, § I, ¶ 1);

**(I)**    Did the court err in permitting the jury to treat Dr. Low as an agent of Lakes Hospital? (Doc. No. 133, § V);

**(J)**    Did the court erroneously allow evidence of grief to be presented to the jury? (Doc. No. 133, § IX(A); Doc. No. 133–2, p. 6; Doc. No. 136, § I, ¶ 1; Doc. No. 136–2, pp. 6–7);

**(K)** Did the court err in allowing photographs of the fetus to be presented to the jury? (Doc. No. 133, § IX(B); Doc. No. 133–2, pp. 6–7; Doc. No. 136, § I, ¶ 1; Doc. No. 136–2, pp. 4–5);

**(L)** Did the court err in allowing Dr. Leavy to testify to matters outside the designation of his testimony? (Doc. No. 133, § IX(C); Doc. No. 136, § I, ¶ 1);

**(M)** Did the plaintiffs waive their EMTALA claim by not submitting to the court timely requested jury instructions on the claim? (Doc. No. 133, § IV);

**(N)** Did the court err in submitting revised damages instructions to the jury? (Doc. No. 133, § VII; Doc. No. 136, § I, ¶ 1);

**(O)** Did the court err in reading the instructions to the jury before any evidence was received? (Doc. No. 133–2, pp. 2–3);

**(P)** Did the court err in failing to grant the various motions for mistrial asserted by the defendants throughout the trial? (Doc. No. 136, § I, ¶ 4; Doc. No. 133, § XIII); and

**(Q)** Was the verdict irrational, arbitrary, excessive, or unjust? (Doc. No. 133, §§ X, XI, & XII; Doc. No. 134; Doc. No. 136, § I, ¶ 1; Doc. No. 136–2, pp. 1–3; Doc. No. 139).

## III. STANDARDS FOR CONSIDERING POST-TRIAL MOTIONS

### A. *Motions for Judgment as a Matter of Law*

The defendants' renewed motions for judgment as a matter of law were filed under Federal Rule of Civil Procedure 50, which provides:

> (a) Judgment as a Matter of Law.
> (1) In General. If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

(2) Motion. A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

(b) Renewing the Motion After Trial; Alternative Motion for a New Trial. If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 10 days after the entry of judgment – or if the motion addresses a jury issue not decided by a verdict, no later than 10 days after the jury was discharged – the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

(1) allow judgment on the verdict, if the jury returned a verdict;

(2) order a new trial; or

(3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(a) & (b).

In considering a motion or renewed motion for judgment as a matter of law filed under Rule 50, the court must "decide the record contains evidence sufficient to support the jury's verdict." *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 863 (8th Cir. 2004). In doing so, the court "'must examine the sufficiency of the evidence in the light most favorable to [the prevailing parties] and view all inferences in [their] favor.'"

*Id*. (quoting *Racicky v. Farmland Indus., Inc.*, 328 F.3d 389, 393 (8th Cir. 2003)). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining [the prevailing party's] position." *Id*. *See Foster v. Time Warner Ent. Co.*, 250 F.3d 1189, 1194 (8th Cir. 2001) ("Judgment as a matter of law is proper only when there is a complete absence of probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party." Internal quotation marks, citation omitted.); *Stevenson v. Union Pacific R. Co.*, 354 F.3d 739, 744 (8th Cir. 2004) (same).

## B.    *Motions for New Trial*

The defendants' motions for new trial were filed under Federal Rule of Civil Procedure 59(a), which provides, "The court may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Rule 59(a) has been explained as follows:

> In evaluating a motion for a new trial pursuant to Rule 59(a), "[t]he key question is whether a new trial should [be] granted to avoid a miscarriage of justice." *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1400 (8th Cir. 1994). A new trial is appropriate when the trial, through a verdict against the weight of the evidence or legal errors at trial, resulted in a miscarriage of justice. *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992). However, legal errors must adversely and substantially impact the moving party's substantial rights to warrant relief. Fed. R. Civ. P. 61.

> Consistent with the plain language of Rule 59(a), the court may grant a partial new trial solely on the issue of damages. Fed. R. Civ. P. 59(a)(1)(A); *see, e.g., Powell v. TPI Petro., Inc.*, 510 F.3d 818, 824-25 (8th Cir. 2007) (remanding for partial new trial on damages). For example, a partial new trial on the issue of damages is appropriate when the jury's verdict is so grossly inadequate as to shock the conscience or to

constitute a plain injustice. *Taylor v. Howe*, 280 F.3d 1210, 1211 (8th Cir. 2002); *First State Bank of Floodwood v. Jubie*, 86 F.3d 755, 759 (8th Cir. 1996). "Each case must be reviewed within the framework of its distinctive facts." *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 922 (8th Cir. 1986) (citing *Hollins v. Powell*, 773 F.2d 191, 197 (8th Cir. 1985)).

"In determining whether or not to grant a new trial, a district judge is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *King v. Davis*, 980 F.2d 1236, 1237 (8th Cir. 1992) (citing *White*, 961 F.2d at 780). "[T]he 'trial judge may not usurp the function of a jury . . . [which] weighs the evidence and credibility of witnesses.'" *White*, 961 F.2d at 780 (quoting *McGee v. S. Pemiscot Sch. Dist.*, 712 F.2d 339, 344 (8th Cir. 1983)). "Instead, a district judge must carefully weigh and balance the evidence and articulate reasons supporting the judge's view that a miscarriage of justice has occurred." *King*, 980 F.2d at 1237.

"The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S. Ct. 188, 66 L. Ed. 2d 193 (1980). On the issue of damages, the propriety of the amount of a verdict "is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of witnesses and which knows the community and its standards. . . .'" *Wilmington*, 793 F.2d at 922 (quoting *Solomon Dehydrating Co. v. Guyton*, 294 F.2d 439, 447-48 (8th Cir. 1961)). "[T]he assessment of damages is especially within the jury's sound discretion when the jury must determine how to compensate an individual for an injury not easily calculable in economic terms." *Stafford* [*v. Neurological Med., Inc.*], 811 F.2d [470,] 475 [(8th Cir. 1987)]; *see also EEOC v. Convergys Customer Mgmt. Group, Inc.*, 491 F.3d 790, 798 (8th Cir. 2007) (same).

*McCabe v. Mais*, 602 F. Supp. 2d 1025, 1029-30 (N.D. Iowa 2008) (Reade, C.J.).

## C.    *Motions to Amend Judgment*

The defendants' motions to amend judgment were filed under Federal Rule of Civil Procedure 59(e), which provides simply that a party may file a motion to alter or amend a judgment not later than ten days after the entry of judgment. Rule 59(e) has been explained as follows:

> The Eighth Circuit Court of Appeals has filled out this rather vague authorization for a new trial by explaining that "'[t]he key question is whether a new trial should [be] granted to avoid a miscarriage of justice.'" *Belk* [*v. City of Eldon*], 228 F.3d [872,] 878 [(8th Cir. 2000)] (quoting *McKnight ex rel Ludwig v. Johnson Controls*, 36 F.3d 1396, 1400 (8th Cir. 1994)). Thus, "[a] new trial is appropriate where the verdict is against the clear weight of the evidence, clearly excessive, or the result of passion or prejudice." *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 930 (8th Cir. 2004) (citing *Ouachita Nat'l Bank v. Tosco Corp.*, 686 F.2d 1291, 1294 (8th Cir. 1982)). In *White v. Pence*, 961 F.2d 776 (8th Cir.1992), the Eighth Circuit observed:
>
> > With respect to motions for new trial on the question of whether the verdict is against the weight of the evidence, we have stated: "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence - it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain a verdict.'" *Ryan v. McDonough Power Equip.*, 734 F.2d 385, 387 (8th Cir. 1984) (citation omitted). . . . These cases establish the fundamental process or methodology to be applied by the district court in considering new trial motions and are in contrast to those procedures governing motions for judgment as a matter of law.
>
> *Id*. at 780. Thus, the court in *Pence* concluded the district court may grant a new trial on the basis that the verdict is against the weight of the evidence, if the first trial results in a

miscarriage of justice. *Id.*; *see also Ogden* [*v. Wax Works, Inc.*], 214 F.3d [999,] 1010 [(8th Cir. 2000)] (stating that a motion for new trial should only be granted if the jury's verdict was against the great weight of the evidence so as to constitute a miscarriage of justice) (citation omitted); *Shaffer v. Wilkes*, 65 F.3d 115, 117 (8th Cir. 1995) (citing *Pence* for this standard); *Nelson* [*v. Boatmen's Bancshares, Inc.*], 26 F.3d [796,] 800 [(8th Cir. 1994)] (stating "[a] motion for new trial should be granted if, after weighing the evidence, a district court concludes that the jury's verdict amounts to a miscarriage of justice."); *Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259, 1266 (8th Cir. 1994) (observing that the correct standard for new trial is the conclusion that "the [jury's] verdict was against the 'great weight' of the evidence, so that granting a new trial would prevent a miscarriage of justice."). While a ruling on a motion for judgment as a matter of law is reviewed *de novo*, a motion for new trial is reviewed for "clear abuse of discretion." *See Belk*, 228 F.3d at 878. Indeed, "'[w]hen the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal.'" *Children's Broad. Corp.* [*v. Walt Disney Co.*], 357 F.3d [860,] 867 [(8th Cir. 2004)] (quoting *Jones v. Swanson*, 341 F.3d 723, 732 (8th Cir. 2003) (internal quotations omitted)).

*Lopez v. Aramark Uniform & Career Apparel, Inc.*, 426 F. Supp. 2d 914, 973-74 (N.D. Iowa 2006) (Bennett, J.).

## IV. ANALYSIS OF ISSUES RAISED IN THE MOTIONS

### A. Does a Physician's Certification Absolve a Hospital from Liability under EMTALA for Transferring a Patient to Another Hospital?

In both its renewed motion for judgment as a matter of law and its motion for new trial, Lakes Hospital argues that because Dr. Steele signed a "Consent for Transfer" form authorizing Lakes Hospital to transfer Ms. Heimlicher to Sioux Valley Hospital, Lakes Hospital cannot be held liable under EMTALA. *See* Joint Ex. 50, p. 15, a copy of which

is attached to this ruling. The court addressed this issue preliminarily in its ruling on Lakes Hospital's second motion for summary judgment (*see Heimlicher v. Steele*, 2007 WL 2384374 at **8-10 (N.D. Iowa, Aug. 17, 2007), but will revisit the issue now that the case has been fully tried.

Lakes Hospital raises this issue in both its Rule 50 motion and its Rule 59(a) motion, so the court will consider the issue under the standards applicable to both rules. The court will decide whether the record contains sufficient evidence to support the jury's verdict, examining the sufficiency of the evidence in the light most favorable to the plaintiffs and viewing all inferences in their favor. The court also will examine the record to determine whether there has been a miscarriage of justice, although the court will not reweigh the evidence or otherwise usurp the function of the jury.

EMTALA ("the Act"), 42 U.S.C. § 1395dd (commonly known as the "Anti-Patient Dumping" Act), was enacted into law in 1985. "[T]he purpose of the statute was to address a distinct and rather narrow problem – the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them." *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136 (8th Cir. 1996) (*en banc*). "A patient is 'dumped' when he or she is shunted off by one hospital to another, the second one being, for example, a so-called 'charity institution.'" *Id*. Despite this "purpose," the statute applies to any individual, whether insured or not, and the fact that a hospital's motivation in a particular case was not to dump an uninsured or indigent patient does not defeat a claim under EMTALA. *Id.*, 91 F.3d at 1137.

Section (a) of EMTALA provides:

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including

> ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

Under this provision, if an individual comes to a hospital emergency room for examination or treatment, the hospital must provide an appropriate medical screening examination, within the hospital's capabilities, to determine "whether or not an emergency medical condition . . . exists." However, EMTALA does not guarantee a proper diagnosis or provide a federal remedy for medical negligence. *Summers*, 91 F.3d at 1137. "EMTALA is not a federal malpractice statute and it does not set a national emergency health care standard; claims of misdiagnosis or inadequate treatment are left to the state malpractice arena." *Id.*

An "inappropriate" screening examination "is one that has a disparate impact on the plaintiff." *Id.*, 91 F.3d at 1138. As the *Summers* court explained:

> Patients are entitled under EMTALA, not to correct or non-negligent treatment in all circumstances, but to be treated as other similarly situated patients are treated, within the hospital's capabilities. It is up to the hospital itself to determine what its screening procedures will be. Having done so, it must apply them alike to all patients.

*Id.* A faulty screening, as opposed to disparate screening or refusing to screen at all, does not contravene the statute. *Id.*, 91 F.3d at 1139.

If, after screening a patient, a hospital determines that the patient has an "emergency medical condition," the hospital must either (A) provide treatment "to stabilize" the medical condition, or (B) transfer the individual to another hospital. *See* EMTALA §§ (b)(1)(A) & (B). For a pregnant woman, an "emergency medical condition" is either (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the woman or her unborn child in serious jeopardy; or (B) if she is having contractions, where there is inadequate time to

effect her safe transfer to another hospital before delivery, or where that transfer may pose a threat to the health or safety of the woman or the unborn child. *See* EMTALA §§ (e)(1)(A) & (B). The term "to stabilize" means, "with respect to an emergency medical condition described in paragraph [(e)](1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph [(e)](1)(B), to deliver (including the placenta)." *See* EMTALA § (e)(3)(A).

A hospital has the duty to stabilize a patient or effect a proper transfer only if the hospital has actual knowledge that the patient has an emergency medical condition. *Summers*, 91 F.3d at 1140; *Baber v. Hospital Corp. of America*, 977 F.2d 872, 883 (4th Cir. 1992) ("[T]he plain language of the statute dictates a standard requiring actual knowledge of the emergency medical condition by the hospital staff"); *see Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996) (EMTALA's stabilization and transfer requirements apply after the hospital determines that the patient has an emergency medical condition); *Urban v. King*, 43 F.3d 523, 526 (10th Cir. 1994) (same). It is not enough that the hospital "should have known" the patient was suffering from an emergency medical condition; the hospital has to have actual knowledge. *Baber*, 977 F.2d at 883; *see also Sauve v. Methodist Hosp.*, 33 Fed. Appx. 248, 248 (8th Cir. 2002). "A reasonableness standard does not apply." *Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1166 (9th Cir. 2002). "The Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." *Baber*, 977 F.2d at 883.

If a hospital performs an appropriate screening of a patient and does not discover an emergency medical condition, then EMTALA would not forbid or regulate the transfer of the patient to another hospital. If a hospital does discover an emergency medical

condition during screening, then the hospital can transfer the patient to another hospital after the condition has been stabilized. *See* EMTALA § (c)(1). Even if the emergency medical condition has not been stabilized, the hospital can transfer the patient to another hospital if either (i) the individual "in writing requests transfer to another medical facility"; or (ii) a physician signs a certification "that based upon the information available at the time of transfer, the medical benefits reasonably expected from appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer." EMTALA § (c)(1)(A)(i) & (ii); *see* Jury Instruction No. 18.[2] As the court held in *Baber*:

> EMTALA's transfer requirements do not apply unless the hospital actually determines that the patient suffers from an emergency medical condition. . . . Accordingly, to recover for violations of EMTALA's transfer provisions, the plaintiff must present evidence that (1) the patient had an emergency medical condition; (2) the hospital actually knew of that condition; (3) the patient was not stabilized before being transferred; and (4) prior to transfer of an unstable patient, the transferring hospital did not obtain the proper consent or follow the appropriate certification and transfer procedures.[3]

*Baber*, 977 F.2d at 883.

Applying these principles to this case, for the Heimlichers to prove their EMTALA claims against Lakes Hospital, they first had to prove all of the following: (1) Ms. Heimlicher came to Lakes Hospital and requested examination or treatment for a medical condition; (2) she had an emergency medical condition; and (3) Lakes Hospital had actual knowledge that she had an emergency medical condition.

None of these matters was seriously disputed at trial. Ms. Heimlicher was brought to Lakes Hospital by ambulance for examination and treatment of vaginal bleeding, pain

---

[2] A copy of Jury Instruction No. 18 is attached to this ruling.

[3] These elements are substantially the same as those submitted to the jury in the present case. *See* Jury Instruction Nos. 19 & 20, copies of which are attached to this ruling.

in her abdomen, and premature uterine contractions, all serious symptoms in a woman who is 34 weeks pregnant. It was obvious that her condition fell within the definition of an "emergency medical condition" under either subsection (e)(1)(A) or subsection (e)(1)(B) of the Act. In section I, paragraph B of Dr. Steele's "Consent For Transfer" form, he checked the box stating that Ms. Heimlicher was a "patient *with an emergency medical condition*." *See* Joint Ex. 50, p. 15 (emphasis added). Because Dr. Steele signed the form, and Jennifer Helle, the Lakes Hospital nurse who was attending Ms. Heimlicher, witnessed the form (*see Id.*, § II.D.2.), they both obviously had actual knowledge that Ms. Heimlicher had an emergency medical condition. As discussed in Section IV.D. of this ruling, *infra*, their knowledge was imputed to Lakes Hospital. *See* Jury Instruction No. 17.[4]

Under these circumstances, Lakes Hospital was prohibited by the Act from transferring Ms. Heimlicher to another hospital absent at least one of the following three justifications: (1) her emergency medical condition was stabilized (EMTALA § (c)(1)); (2) her emergency medical condition was not stabilized, but she requested transfer to another hospital (EMTALA § (c)(1)(A)(i)); or (3) her emergency medical condition was not stabilized, but a physician signed a certification that the medical benefits reasonably expected from medical treatment at another hospital outweighed the increased risks to her and her unborn child from the transfer (EMTALA § (c)(1)(A)(ii)). The court will examine each of these possible justifications for Ms. Heimlicher's transfer in light of the evidence in this case.

---

[4] This instruction describes the liability of a hospital for the acts and omissions of its employees, officers, directors, and agents. A copy of Jury Instruction No. 17 is attached to this ruling.

## 1.    Was Ms. Heimlicher's emergency medical condition stabilized before she was transferred to Sioux Valley Hospital?

The first possible justification for transferring Ms. Heimlicher was that her emergency medical condition had been stabilized before the transfer. The evidence does not support such a conclusion. While in the care of Lakes Hospital and its agents, Ms. Heimlicher was having contractions and was suffering from acute symptoms, including profuse vaginal bleeding and severe pain. The absence of immediate medical attention reasonably could have been expected to place her health and the health of her unborn child in serious jeopardy, and subjecting her to a 100-mile ambulance ride through a snow storm posed a clear threat to the health and safety of the mother and the fetus. Under these circumstances, Ms. Heimlicher's condition could have been stabilized in only one of two ways. First, Lakes Hospital could have provided the medical treatment necessary to assure, within reasonable medical probability, that no material deterioration of her condition was likely to result from, or occur during, the transfer. This did not happen. The only treatment given to Ms. Heimlicher was medication to stop her contractions, which did not address the possible causes of her pain or vaginal bleeding, such as an abrupting placenta or a ruptured uterus. The treatment provided no assurances that her condition would not deteriorate during the ambulance ride. Second, Lakes Hospital could have delivered the child. *See* EMTALA § (e)(3)(A). The second option was not even considered.

On the "Consent For Transfer" form, Dr. Steele marked the following box to certify that Ms. Heimlicher's condition had been stabilized: "This patient with an emergency medical condition has been stabilized such that, within a reasonable degree of medical certainty, no material deterioration of this patient's emergency medical condition is likely to result from or occur during transfer." *See* Joint Ex. 50, p. 15, § I, ¶ B. The certification is both curious and troublesome. While at Lakes Hospital, Ms. Heimlicher continued to have contractions, pain, and vaginal bleeding. Dr. Steele knew these

symptoms were continuing, and he knew that likely explanations for the symptoms were an abrupting placenta or a ruptured uterus, both of which posed a serious risk of material deterioration in Ms. Heimlicher's condition during transfer, and the possibility of death to the mother and the fetus.

Ms. Heimlicher's condition dramatically worsened within a few minutes after she was placed in the ambulance. At that time, she had not yet been transferred to Sioux Valley Hospital, and she was still in the care of Lakes Hospital and its agents. The medical records establish that throughout the ambulance ride, it was increasingly apparent that her health and the health of her unborn child were in serious jeopardy, and that immediate medical treatment was necessary to address the deteriorating condition. Before the ambulance was more than a few miles from Lakes Hospital, it should have been obvious to Nurse Helle that Ms. Heimlicher was far from stable. EMTALA's requirement that the patient be stabilized before transfer did not disappear simply because the ambulance had started on its journey. The only way to stabilize Ms. Heimlicher's condition was to deliver the baby, and this was not done.

Dr. Steele marked the box on the form for certifying that Ms. Heimlicher's emergency medical condition "has been stabilized," and did not mark the box on the form for certifying that the patient's emergency medical condition "has not been stabilized." *See* Joint Ex. 50, p. 15, § I, ¶ C. Significantly, he then completed the part of the form for justifying the transfer of an *unstabilized* patient. *See* EMTALA § (c)(1)(A)(ii). If Dr. Steele thought Ms. Heimlicher's condition had, in fact, been stabilized, this part of the form should have been left blank. The fact that Dr. Steele completed this part of the form suggests that when he signed the form, he knew her condition had not, in reality, been stabilized.

The jury found that Ms. Heimlicher's emergency medical condition had not been stabilized at the time of transfer, and the evidence fully supports this finding. Therefore,

the plaintiffs proved that the first possible justification for transferring her to another hospital did not exist.

### 2. *Did Ms. Heimlicher make a written request to be transferred to Sioux Valley Hospital?*

The second possible justification for transfer under EMTALA was that Ms. Heimlicher's emergency medical condition had not been stabilized, but she requested, in writing, a transfer to another medical facility. The record establishes that she did not make such a request, although she did sign the "Consent For Transfer" form. In fact, Ms. Heimlicher signed the form in blank and on the wrong line – where a person would sign the form on behalf of a patient, not where the patient would sign. Later, someone placed an arrow from her signature to the correct line on the form, and checked the box "consent to transfer." Ms. Heimlicher had the option of marking a box on the form to request a transfer, but she did not do so. *Compare* Joint Ex. 50, p. 15, *with* Pl. Ex. 5.[5]

Under subsection (c)(1)(A)(i) of the Act, a written *request* for transfer authorizes a hospital to transfer a patient with an emergency medical condition that has not been stabilized to another hospital. A *consent* to transfer does not give a hospital this authority. Ms. Heimlicher never requested transfer from Lakes Hospital, so the second possible justification for transferring her to another hospital did not exist.

### 3. *Did Dr. Steele properly certify that the benefits from the transfer outweighed the risks?*

The third possible justification for transfer under EMTALA was that Ms. Heimlicher's emergency medical condition had not been stabilized, but a physician signed a proper certification authorizing the transfer. Lakes Hospital states it "may transfer an unstabilized patient without incurring liability where a physician certifies that, based upon

---

[5]Copies of these exhibits are attached to this ruling.

the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risk to the individual, and in the case of labor, to the unborn child, from effecting the transfer." Doc. No. 132-2, p. 2 (citing EMTALA § (c)(1)(A)(ii)). The Hospital notes that Dr. Steele provided such a certification when he signed the "Consent For Transfer" form (Joint Ex. 50, p. 15). According to the Hospital, it "did not have an independent duty to determine the patient's medical condition because it was entitled to rely on the certification of a physician." The Hospital maintains that the jury should not have been permitted to look beyond the certification form itself, and argues the court erred in instructing the jury otherwise. Doc. No. 133-2, pp. 4-5; *see* Jury Instruction No. 19, ¶ 3 (requiring the certification to be "reasonable").[6] The Hospital argues the form provides it with a complete defense to the plaintiffs' EMTALA claim. The plaintiffs respond by arguing that the "Consent For Transfer" form signed by Dr. Steele was seriously deficient, and therefore does not absolve Lakes Hospital from liability under EMTALA. The question presented to the jury at trial was whether, prior to Ms. Heimlicher's transfer, Lakes Hospital "follow[ed] the appropriate certification . . . procedure." *Baber*, 977 F.2d at 883.

The elements of the "certification" defense were described to the jury in Jury Instruction No. 20. To prove this defense, Lakes Hospital was required to prove (1) a physician who was acting as its agent or employee signed a certification that the medical benefits reasonably expected from the transfer of Ms. Heimlicher to the Sioux Valley Hospital outweighed the increased risks from the transfer to her and the unborn child, and (2) before signing the certification, the physician deliberated and weighed the medical risks and benefits of the transfer, and made a reasonable determination, based on the information available to him at the time, that the medical benefits reasonably expected

---

[6] A complete copy of Jury Instruction No. 19, in which the court describes the elements of the plaintiffs' EMTALA claim, is attached to this ruling.

from the transfer outweighed the increased risks from the transfer to Ms. Heimlicher and the unborn child.

There is no dispute that Dr. Steele signed a "Consent For Transfer" form. On the form, he certified as follows: "Based on the expected **benefits** of *delivery on C–section of premature fetus 34 weeks* and foreseeable **risks** of *more bleeding, painful contractions* to this patient, and based upon the information available to me at the time of this patient's transfer, I believe the medical benefits reasonably expected from the provision of appropriate medical treatment at another facility outweigh the increased risks to the patient's (and/or fetus') medical condition from effecting transfer." Joint Ex. 50, p.15 (emphasis in original). There is, however, some question about whether or not a defense based on Dr. Steele's certification of "benefits versus risks" is even available to Lakes Hospital. On the Consent For Transfer form, Dr. Steele marked the box to certify that Ms. Heimlicher had been stabilized, and left unmarked the box that would have certified Ms. Heimlicher's emergency medical condition had not been stabilized. *Compare* § I, ¶ B *with* § I, ¶ C, on Joint Ex. 50. The certification of "benefits versus risks" under EMTALA subsection (c)(1)(A)(ii) applies to *unstabilized* patients, not to *stabilized* ones. Nevertheless, because the evidence establishes that Ms. Heimlicher was not, in fact, stabilized, the court will address Lakes Hospital's argument on this issue.

Lakes Hospital cites *Lopez-Soto v. Hawayek,* 175 F.3d 170, 175-176 (1st Cir. 1999), in support of its position. In *Lopez-Soto*, the First Circuit Court of Appeals held that under EMTALA, the screening requirement is limited to emergency departments, but the stabilization requirement "unambiguously imposes certain duties on covered hospitals vis-a-vis any victim of a detected medical emergency, regardless of how that person enters the institution or where within the walls he may be when the hospital identifies the problem." *Id.*, 175 F.3d at 173. On pages 175 to 176 of *Lopez-Soto*, the pages specifically cited in Lakes Hospital's brief (*see* Doc. No. 132-2, p. 2), the court made a passing reference to the certification process, but did not address any of the issues

currently before this court. *See Lopez-Soto*, 175 F.3d at 176 ("Subsection (c) generally prohibits transfers of unstabilized patients unless . . . a physician has certified that the medical benefits of an appropriate transfer outweigh the attendant risks, *see* [42 U.S.C.] § 1395dd(c)(1)(A)(ii)."). The case is not helpful.

Lakes Hospital also relies on *Burditt v. United States Department of Health and Human Services*, 934 F.2d 1362, 1371 (5th Cir. 1991). The court in *Burditt* does provide some helpful analysis on this issue. The court held as follows:

> A hospital may violate [the certification] provision in four ways. First, before transfer, the hospital might fail to secure the required signature from the appropriate medical personnel on a certification form. But the statute requires more than a signature; it requires a signed certification. Thus, the hospital also violates the statute if the signer has not actually deliberated and weighed the medical risks and the medical benefits of transfer before executing the certification. FN9/ Likewise, the hospital fails to make the certification required by 42 U.S.C. § 1395dd(c)(1)(A)(ii) if the signer makes an improper consideration a significant factor in the certification decision. [Footnote omitted.] Finally, a hospital violates the statute if the signer actually concludes in the weighing process that the medical risks outweigh the medical benefits of transfer, yet signs a certification that the opposite is true. FN11/

> > FN9. In revising EMTALA, Congress has expressly provided that medical personnel must make a determination regarding medical risks and benefits, not just sign a paper stating as much. *See* 42 U.S.C.A. § 1395dd(c)(1)(A)(iii) (West Supp. 1991).

> > .  .  .

> > FN11. Evidence that a signer was aware of certain medical risks and medical benefits before making a certification decision when that person claims not to have considered those risks and

> benefits may be used to prove this fourth class of
> violation under 42 U.S.C. § 1395dd(c)(1)(A)(ii).

*Id.*, 934 F.2d at 1371. The court will review the record to see if a reasonable jury could have found that Lakes Hospital violated the certification provision of EMTALA in any of the ways identified in *Burditt*.

There is no question that Dr. Steele signed the Consent for Transfer form, so the first potential violation identified in *Burditt* did not occur. There also is no evidence that he signed the form after reaching a conclusion that the medical risks actually outweighed the medical benefits of transfer. However, the evidence does suggest that Dr. Steele signed the form without actually deliberating and weighing the medical risks and benefits of the transfer, and he gave improper consideration to significant factors in the certification decision.

On the form, Dr. Steele listed the expected benefits from the proposed transfer as "delivery on C-section of premature fetus 34 weeks." He listed the foreseeable risks as "more bleeding, painful contractions." The evidence establishes that these were not the true potential benefits and risks of transfer, and Dr. Steele was aware of this fact.

The supposed benefit of "delivery on C–section" was not a benefit at all. C–sections were routinely performed at Lakes Hospital. There was no benefit from transferring Ms. Heimlicher to a hospital 100 miles away for a procedure that could have been performed without a transfer. The supposed expected benefit of better treatment for a premature baby delivered at 34 weeks also was not a true benefit. Although Sioux Valley Hospital had an advanced neonatal unit and Lakes Hospital did not, the fetus was beyond the age where complications from prematurity were likely. Lakes Hospital was completely capable of caring for a baby at 34 weeks or, if necessary, preparing the baby for transport to another hospital, such as Sioux Valley Hospital, after delivery. Thus, both of the "expected benefits" listed on the form were available at Lakes Hospital without the

transfer. A reasonable jury could have found that Dr. Steele knew any expected benefits from the transfer were minimal.

Dr. Steele listed the foreseeable risks of transfer as "more bleeding and painful contractions." Both of these "risks" were present regardless of whether or not Ms. Heimlicher was transferred. Dr. Steele was well aware of other serious increased risks of the transfer that he did not list on the form. His records show that when he was evaluating Ms. Heimlicher, he considered diagnoses of a ruptured uterus, placenta previa, and placenta abruptio, all serious, life-threatening conditions, and he specifically discussed these possibilities with Dr. Fiegen before the transfer. He knew that transferring a patient with any of these conditions presented a risk of death to the mother and fetus. He also knew that any of these diagnoses would have precluded any consideration of transfer, and would have required an immediate C–section. Although he had not ruled out a ruptured uterus or an abrupted placenta, neither of these risks was listed on the form.

In *Vargas v. Del Puerto Hospital*, 98 F.3d 1202 (9th Cir. 1996), the Ninth Circuit Court of Appeals considered an appeal from a bench trial of an EMTALA claim. The plaintiff in that case, as here, argued that the certification was deficient because the certifying doctor failed to include an accurate summary of the benefits and risks. The court held as follows:

> The certification requirement is part of a statutory scheme with an overarching purpose of ensuring that patients . . . receive adequate emergency medical care. *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255 (9th Cir. 1995) (citing H.R. Rep. No. 241, 99th Cong., 1st Sess. (1986), *reprinted in* 1986 ISKCON 726-27). The purpose of the certification requirement in particular is to ensure that a signatory physician adequately deliberates and weighs the medical risks and medical benefits of transfer before effecting such a transfer.
>
> Congress surely did not intend to limit the inquiry as to whether this deliberation process in fact occurred to an examination of the transfer certificate itself. While such a contemporaneous record may be the best evidence of what a

> physician was thinking at the time, we cannot accept the
> proposition that the only logical inference to be drawn from
> the absence of a written summary of the risks is that the risks
> were not considered in the transfer decision. Other factors
> might account for the absence of such a summary, such as the
> time-pressure inherent in emergency room decision-making.
> Although a contemporaneous record is certainly preferable, we
> believe it would undermine congressional intent to foreclose
> consideration of other evidence surrounding the transfer
> decision. *See Romo v. Union Memorial Hosp., Inc.*, 878
> F. Supp. 837, 844 (W.D.N.C. 1995) (absence of summary of
> risk and benefits on transfer certificate does not create
> EMTALA liability as a matter of law, but creates a jury
> question as to whether risk/benefit analysis was properly made
> by physician).

*Vargas*, 98 F.3d at 1205.

The *Vargas* court held the hospital was not entitled to prevail simply because a doctor signed a certificate, and the fact-finder was not limited to consideration of only the transfer certificate, but could consider other factors as well. The court held that the ultimate question as to whether a proper risk/benefit analysis was made was an issue for the fact-finder at trial. *Id.; see also Romo v. Union Memorial Hosp., Inc.*, 878 F. Supp. 837, 844 (W.D.N.C. 1995) (absence of summary of risks and benefits on transfer certificate does not create EMTALA liability as a matter of law, but creates a jury question as to whether risk/benefit analysis was properly made by physician); *cf. Cherukuri v. Shalala*, 175 F.3d 446, 450 (6th Cir. 1999) (question is whether doctor was "negligent" in transferring a patient when, under the circumstances, the doctor knew or should have known the benefits of transfer did not outweigh the risks).

This court agrees with the *Burditt* holding that a doctor's certification "requires more than a signature." *Burditt*, 934 F.2d at 1371. A hospital is not entitled to the benefit of the certification defense under section (c)(1)(A)(ii) of the Act "if the signer has not actually deliberated and weighed the medical risks and the medical benefits of transfer before executing the certification," or "if the signer makes an improper consideration a

significant factor in the certification decision." *Id*. The evidence establishes that Dr. Steele did not deliberate and weigh the medical risks and benefits of the transfer, and he did not make a reasonable determination, based on the information available to him at the time, that the medical benefits reasonably expected from the transfer outweighed the foreseeable risks from the transfer to Ms. Heimlicher and her unborn child. *See* Jury Instruction No. 20, ¶ 2. By justifying the transfer with nonexistent "benefits" and "risks," and ignoring the true foreseeable risks of the transfer, Dr. Steele gave improper consideration to significant factors in the certification decision. *See* EMTALA § (c)(1)(A)(ii). He over-valued minimal or insignificant expected benefits, and he ignored serious foreseeable risks. This invalidated his certification. Thus, the third possible justification for transferring Ms. Heimlicher to another hospital did not exist.

To the extent Lakes Hospital is arguing it is not responsible for the acts or omissions of a doctor who signs an EMTALA certification form, the argument does not apply here. This is not a case where the doctor signing the form was an independent contractor, with no agency or employment relationship with the Hospital. Here, the doctor was an agent of Lakes Hospital, and the Hospital acted through him. In this circumstance, Lakes Hospital is liable for his acts and omissions. *See* discussion in Section IV.D. of this ruling, *infra*; *see also* Jury Instruction No. 17.

Lakes Hospital's renewed motion for judgment as a matter of law and its motion for new trial on this ground are **denied**.

**B.      *Did the Court Err in Placing the Burden of Proof on the Certification Defense on Lakes Hospital?***

Lakes Hospital argues, "Instruction No. 20 relating to the certification defense, was legally erroneous because it placed the burden of proof upon the hospital to prove that the medical judgment of the physician who certified that the benefits of transfer exceeded the risk, was reasonable when the hospital had no such duty under EMTALA as the hospital

was entitled to rely upon the medical judgment of a physician." Doc. No. 133-2, p. 4. Lakes Hospital cites no authorities in support of this argument.

Generally, as explained in Jury Instruction No. 5, "The obligation to prove a fact, or 'the burden of proof,' is upon the party whose claim depends upon that fact." *See Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1293 (8th Cir. 1997) ("It is fundamental that a party pleading a claim or defense has the burden of proof to establish that claim or defense") (citing Fed. R. Civ. P. 8 & 9). Because Lakes Hospital asserted the certification defense, it had the burden of proving the defense.

Whatever the merits of this argument, it was not raised at trial, so it has been waived. *See* Fed. R. Civ. P. 51(d)(1)(A) (party may assert "error in an instruction actually given, *if that party properly objected*") (emphasis added); *Doyne v. Union Electric Co.*, 953 F.2d 447, 450 (8th Cir. 1992) (Rule 51 requires litigants to raise timely objections to instructions to afford trial court an opportunity to cure a defective instruction and to prevent litigants from covertly relying on the error in order to ensure a new trial in the event of an adverse verdict); *see also Dupre v. Fru-Con Eng'g, Inc.*, 112 F.3d 329, 334 (8th Cir. 1997) (making objections "on the record" entails not only stating the objection, but also stating the specific grounds for that objection); *Cincinnati Ins. Co. v. Bluewood, Inc.*, 560 F.3d 798, 805 (8th Cir. 2009) (same).

In any event, the evidence discussed in Section IV.A. of this ruling, *supra*, firmly establishes that the certification signed by Dr. Steele was inappropriate, so any error in the instruction was harmless. *Rush v. Smith*, 56 F.3d 918, 922 (8th Cir. 1995) (verdict should be reversed only if error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected).

Lakes Hospital's motion for new trial on this ground is **denied**.

### C. Did the Court Err in Instructing the Jury on Dr. Steele's Negligence?

Dr. Steele argues the court erred in allowing the jury to find him negligent in ordering Ms. Heimlicher's transfer from Lakes Hospital to Sioux Valley Hospital. Doc. No. 136, § I, ¶ 2. He states the following in his brief:

> In Jury Instruction No. 15, the court instructed the jury that it could find Dr. Steele was negligent in "transferring Ms. Heimlicher to Sioux Valley Hospital without first determining that her medical condition and the medical condition of the unborn child were not likely to materially deteriorate during the transfer." The language utilized in this instruction appears to have been drawn from the definitions of the terms "to stabilize" and "stabilized" in EMTALA, 42 U.S.C. § 1395dd(e)(3)(A) and (B). The use of this language improperly injected an inapplicable statutory standard into the common law negligence equation.

Doc. No. 136-2, p. 5. Dr. Steele argues that because a claim cannot be brought against a doctor under EMTALA,[7] the cause of action described in Jury Instruction No. 15[8] also cannot be brought against him.

This argument assumes that because there is a potential cause of action under EMTALA against Lakes Hospital, a common law claim of negligence arising out of the same facts cannot be pursued against Dr. Steele. Dr. Steele has cited no authorities to support this argument.

A doctor commits malpractice if he commits an affirmative act of negligence or if his actions demonstrate either a lack of skill or care, or failure to give careful and proper attention to his patient. *Lagerpusch v. Lindley*, 1037, 115 N.W.2d 207, 210 (1962); *see*

---

[7] The doctor cannot be held liable under subsection (d)(2)(A) of the Act. As this court has previously held, "EMTALA does not provide a cause of action for damages against an individual physician." *Heimlicher v. Steele*, 442 F. Supp. 2d 685, 692 (N.D. Iowa 2007).

[8] A copy of Jury Instruction No. 15 is attached to this ruling.

Jury Instruction No. 13.[9]  To establish a *prima facie* case of medical malpractice, a plaintiff must produce evidence: (1) establishing the applicable standard of care, (2) demonstrating a violation of this standard, and (3) developing a causal relationship between the violation and the injury sustained.  *Oswald v. LeGrand*, 453 N.W.2d 634, 635 (Iowa 1990).  As the Iowa Supreme Court held in *Peppermeier v. Murphy*, 708 N.W.2d 57 (Iowa 2005),

> To establish a *prima facie* case of medical malpractice, the plaintiff must submit evidence that shows the applicable standard of care, the violation of the standard of care, and a causal relationship between the violation and the harm allegedly experienced by the plaintiff.  *Phillips* [*v. Covenant Clinic*], 625 N.W.2d [714,] 718 [(Iowa 2001)].  Generally, expert testimony is required to establish specific negligence of a physician. *Kennis v. Mercy Hosp. Med. Ctr.*, 491 N.W.2d 161, 165 (Iowa 1992).

*Id.*, 708 N.W.2d at 61-62.

The plaintiffs in the present case proved all of the elements of a negligence claim against Dr. Steele by offering competent testimony and other evidence on each element of a *prima facie* case.  The court disagrees with Dr. Steele's argument that a claim against a doctor for transferring an unstable patient from one hospital to another, in violation of the applicable standard of care and resulting in harm to the patient, is not an appropriate specification of negligence.  The court also disagrees with his contention that this is not an appropriate specification of negligence simply because an EMTALA claim cannot be brought against him.

Dr. Steele's motions for new trial and for judgment as a matter of law on this ground are **denied**.

---

[9]A copy of Jury Instruction No. 13, describing a physician's duty of care, is attached to this ruling.

Lakes Hospital argues the court erred in instructing the jury that the Hospital had a common law duty to diagnose and treat Ms. Heimlicher's medical condition.[10]  The Hospital maintains it had no right to diagnose or treat Ms. Heimlicher because "such duties can only be performed by a physician."  Doc. No. 133, p. 6.  The Hospital's position is that because it is an entity and not a doctor, it cannot practice medicine.

In support of this argument, the Hospital cites *State v. Miller*, 542 N.W.2d 241, 246-47 (Iowa 1995).  *Miller* is a criminal case in which the defendant was convicted of practicing medicine without a license.  On appeal, he argued the record contained insufficient evidence to support the conviction.  The Iowa Supreme Court discussed the instructions given to the jury defining the practice of medicine, and concluded there was sufficient evidence to support the conviction.  *Id.*, 542 N.W. 2d at 246-47.  This court can find nothing in the *Miller* case to support the Hospital's argument on this issue.

In its reply brief, the Hospital argues paragraph (1)(a) of Jury Instruction No. 16 "imposed a direct duty on the hospital to diagnose a medical condition and forecast how the condition would, or would not, change."  Doc. No. 133-2, p. 4.  The Hospital asserts:

> As a matter of law a hospital, as a corporate entity cannot diagnose or treat a medical condition.  Although the hospital had the duty to provide emergency room care, the hospital satisfied that duty by providing for the services of an emergency room physician, Dr. Steele.  As instructed in Instruction No. 17, the hospital may or may not be liable for the acts of the emergency room physician.  Because the hospital's liability for the act of the emergency room physician is indirect, it was error to instruct that the hospital had a direct

---

[10]In Jury Instruction No. 16, the court instructed the jury in paragraph 1(a) that the Hospital could be found negligent for "failing to recognize Ms. Heimlicher's need for an emergency delivery," and in paragraph 1(b) for "transferring Ms. Heimlicher to Sioux Valley Hospital without first determining that her medical condition and the medical condition of the unborn child were not likely to materially deteriorate during the transfer."  A copy of Jury Instruction No. 16 is attached to this ruling.

and independent duty at common law, to diagnose and treat the patient. Instruction number 15 which imposed duties on Dr. Steele and mirrored Instruction 16 as to the hospital, which when considered with the agency liability Instruction number 17, doubled the duty on the hospital, which mostly likely had an adverse effect on the allocation of fault as between the defendants, as is evidence in the ratio of the jury's verdict.

The court must confess that it cannot understand what the Hospital is attempting to say in this argument, but the court is fairly certain the argument was not presented during trial. To the extent it was not, it has been waived. *See* Fed. R. Civ. P. 51(d)(1)(A) (party may assert "error in an instruction actually given, *if that party properly objected*") (emphasis added); *Cincinnati Ins. Co.*, 560 F.3d at 805. Also, no authorities are cited in support of the argument, as required by Local Rule 7.b.3, and the court cannot independently discern anything meritorious in the argument.

As the court stated in Jury Instruction No. 17, a hospital can be held vicariously liable "for the acts or omissions of its employees, officers, directors, and agents performed within the scope of their authority." As the Iowa Supreme Court explained in *Wilkins v. Marshalltown Medical and Surgical Center*, 758 N.W.2d 232 (Iowa 2008):

> [A]n emergency-room patient looks to the hospital for care, and not to the individual physician - the patient goes to the emergency room for services, and accepts those services from whichever physician is assigned his or her case.'" *Wolbers v. The Finley Hosp.*, 673 N.W.2d 728, 734 (Iowa 2003) (quoting 40A Am. Jur. 2d *Hospitals & Asylums* § 48, at 460 (1999)); *see also Mehlman v. Powell*, 281 Md. 269, 378 A.2d 1121, 1124 (1977) (stating "all appearances suggest and all ordinary expectations would be that the Hospital emergency room, physically a part of the Hospital, was in fact an integral part of the institution"); *Arthur v. St. Peters Hosp.*, 169 N.J. Super. 575, 405 A.2d 443, 447 (1979) (noting that absent a situation where the patient is directed by his own physician or where the patient makes an independent selection as to which physicians

> he will use, it is the reputation of the hospital itself upon which
> the patient relies).

*Wilkins*, 758 N.W.2d at 237. *See Wolbers v. The Finley Hosp.*, 673 N.W.2d 728, 734 (Iowa 2003) ("A hospital has an absolute duty to its emergency-room patients to provide competent medical care, a duty which cannot be delegated.") (citing 40A Am. Jur. 2d *Hospitals & Asylums* § 48, at 460 (1999)).

Doctors practicing in a hospital emergency room can be agents of the hospital even if they are independent contractors of the hospital, and the hospital can be held responsible for malpractice committed by them. *See Wilkins*, 758 N.W. 2d at 236-37 (hospital is liable to patient for negligence of emergency room doctor who is independent contractor of hospital if patient could infer an agency relationship from the circumstances). Substantial evidence established that Dr. Steele was an agent of Lakes Hospital, so the Hospital is liable for any negligence committed by him.

The court finds "the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 252 F.3d 1010, 1012-13 (8th Cir. 2001). Substantial evidence in the record supports the jury's decision that Lakes Hospital was vicariously liable for Dr. Steele's negligence, as well as for the negligence of its employees, Ms. Evans and Nurse Helle. Lakes Hospital's motion for new trial on this ground is **denied**.

*E.*     ***Were the State-Law Negligence Claims against Lakes Hospital***
         ***Preempted by EMTALA?***

Lakes Hospital argues that as a result of section (f) of EMTALA[11] and the Supremacy Clause in Article VI of the United States Constitution, it "cannot be held liable for common law negligence under state law." Doc. No. 133, p. 4.

Congressional intent determines whether federal law preempts a state statute. *See California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 107 S. Ct. 683, 689, 93 L. Ed. 2d 613 (1987). In ascertaining Congressional intent, a court must consider any legislative provision, such as section (f) of EMTALA, that explicitly addresses preemption. "When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to preempt state laws from the substantive provisions of the legislation." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517, 112 S. Ct. 2608, 2618, 120 L. Ed. 2d 407 (1992).

Lakes Hospital notes that in the plaintiffs' negligence claim against the Hospital, they allege the Hospital "had a duty to determine whether Laura Heimlicher's medical condition and that of the unborn child were, or were not, likely to materially deteriorate during the transfer." Doc. No. 132-2, p. 5; *see* Jury Instruction No. 16. The Hospital argues, "In contrast, EMTALA provides in its certification defense that a hospital is not liable for transferring a patient in an unstable medical condition where a physician certifies that the benefits exceed the risk of transfer." Doc. No. 132-2, p. 5. The Hospital asserts it "cannot be liable under state law where it is not liable under federal law, [and] the plaintiffs' negligent transfer claim fails as a matter of law." *Id*. This argument is based on the faulty premise that a hospital cannot be liable for its negligent transfer of a patient

---

[11]Section (f) of the Act provides, "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section."

under state law if it is not liable for the transfer under EMTALA. No principle of preemption or supremacy requires such a result.

Preemption requires that the state statute being preempted directly conflict with the federal law. This can take place in either of two ways: first, a state law can be preempted if "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43, 83 S. Ct. 1210, 1217-18, 10 L. Ed. 2d 248 (1963); or second, a state law can be preempted if the state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404, 85 L. Ed. 581 (1941). *See Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993).

Lakes Hospital notes EMTALA provides for the recovery of damages available under state personal injury law (EMTALA § (d)(2)(A)),[12] but subject to the "certification" defense in section (c)(1)(A)(ii) of the Act. The Hospital argues that because a state-law personal injury claim against a hospital is not subject to the EMTALA "certification" defense, allowing the state-law claim would render the enforcement of EMTALA "a physical impossibility." This argument is not persuasive. Even though the Act provides a hospital with a defense to certain claims under EMTALA, it does not follow that Congress intended to preempt state-law claims arising out of the same facts. Such a construction of the Act would render subsection (d)(2)(A) meaningless, because all of the state law claims that could be asserted under that subsection would be preempted. A statute should not be interpreted in a way the renders one of the sections of the statute meaningless. *See Bueford v. Resolution Trust Corp.*, 991 F.2d 481, 486 (8th Cir. 1993) ("[S]tatutory provisions are to be read, whenever possible, in a way that does not render other provisions meaningless.")

---

[12]Subsection (d)(2)(A) of the Act provides, "Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate."

36

With regard to the second way a state law can be preempted, it is difficult to see how permitting state-law negligence claims against a hospital would create an obstacle to the accomplishment and execution of the full purposes of EMTALA. According to one court, "The core purpose of EMTALA . . . is to prevent hospitals from failing to examine and stabilize uninsured patients who seek emergency treatment." *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999). Another court summarized the "core purpose" of EMTALA as follows:

> Its core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat. *Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir. 1993) (recognizing that "[u]nder traditional state tort law, hospitals are under no legal duty to provide [emergency care to all]" and holding that EMTALA's purpose is simply to impose on hospitals the legal duty to provide such emergency care); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991) (holding that EMTALA's purpose is "to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat"). Numerous cases and the Act's legislative history confirm that Congress's sole purpose in enacting EMTALA was to deal with the problem of patients being turned away from emergency rooms for non-medical reasons.

*Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996). The purpose of section (f) of the Act was to "[create] a remedy that could not be eliminated." *Root v. Liberty Emergency Physicians, Inc.*, 68 F. Supp. 2d 1086, 1092 (W.D. Mo. 1999). Allowing a plaintiff to proceed with a state-law malpractice claim does not conflict with any of these purposes.

Lakes Hospital relies on *Riegel v. Medtronic, Inc.*, ___ U.S. ___, ___, 128 S. Ct. 999, 1003, 169 L. Ed. 2d 892 (2008) (federal preemption of the regulation of medical devices); *Chicago and North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 101 S. Ct. 1124, 67 L. Ed. 2d 258 (1981) (preemption of a shipper's claims

against a carrier regulated by the Interstate Commerce Act); and *Van Natta v. Sara Lee Corp.*, 439 F. Supp. 2d 911, 933 (N.D. Iowa 2006) (preemption of state laws by ERISA). None of these cases supports Lakes Hospital's preemption argument in the present case.

In *Root v. New Liberty Hospital District*, 209 F.3d 1068 (8th Cir. 2000), the Eighth Circuit Court of Appeals applied section (f) of the Act, together with the Supremacy Clause, to strike down a state sovereign immunity statute. In *Root*, the plaintiffs sued a hospital under EMTALA asking for damages under Missouri personal injury law, as provided by section (d)(2)(A) of the Act. The defendant, a state agency, argued that Missouri personal injury law, including the Missouri sovereign immunity statute, is incorporated into EMTALA by section (d)(2)(A), so sovereign immunity should bar the plaintiffs' claims.

The Eighth Circuit pointed out that section (f) applies only to a "State or local law *requirement*," *id.*, 209 F.3d at 1070 (emphasis in original), and the state sovereign immunity statute does not require anyone to do anything. Instead, it informs potential plaintiffs that they may not sue public entities unless sovereign immunity is expressly waived. Because the state sovereign immunity statute is not a "State or local law requirement," it can be preempted if it directly conflicts with EMTALA. The court held, "Missouri's sovereign immunity statute is in direct conflict with 42 U.S.C. § 1395dd(d)(2)(A). The supremacy clause, *see* U.S. Const. art. VI, cl. 2, therefore dictates that Missouri's sovereign immunity statute must yield." *Id.*

Iowa negligence law does not conflict at all with EMTALA. As observed by the federal courts, "The legislative history of EMTALA demonstrates that Congress never intended to displace state malpractice law. . . . [The] intent [was] to supplement, but not supplant, state tort law." *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999). "EMTALA is not a substitute for state malpractice actions, although 'there may arise some areas of overlap between federal and local causes of action.'"

*Barris v. County of Los Angeles*, 972 P.2d 966, 972 (Cal. 1999) (citing *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037 (11th Cir. 1994)).

It would be illogical for this court to hold that a federal law not intended to provide a remedy for medical malpractice, and that expressly leaves such claims to state law, preempts a state law intended to provide that remedy. "EMTALA and state tort laws provide distinct remedies for different wrongs." *Tinius v. Carroll County Sheriff Dept.*, 321 F. Supp. 2d 1064, 1088 (N.D. Iowa 2004). Lakes Hospital's motions for new trial and for judgment as a matter of law on this ground are **denied**.

**F.    Did the Court Err in Refusing to Submit Ms. Heimlicher's Comparative Fault to the Jury?**

The defendants argue the court erred in excluding evidence that Ms. Heimlicher was at fault "in failing to seek medical attention when it was obvious that she should do so." Doc. No 133, § IX(d), p. 8; Doc. No. 136, § I, ¶ 3. They claim the court erred in excluding evidence of her fault, and argue her comparative fault should have been submitted to the jury.

On the evening of February 11, 2004, Ms. Heimlicher called "911" from her home. She at first told the operator she did not want an ambulance, but a short time later, she changed her mind and agreed that an ambulance should be sent. Scott Greer, an Emergency Medical Technician who lived in her neighborhood, arrived at her house before the ambulance. In his notes, he quoted Ms. Heimlicher as saying "that while shopping and upon returning home she began to bleed and [she said] that the bathroom was a mess and [she] had a towel between her legs." Joint Ex. 50, pp. 1-2. He tried to get Ms. Heimlicher to sit down, but she continued walking around, stating that "it hurt too bad" when she sat down. *Id.*, p. 3. During trial, the defendants proffered testimony by Dr. Mark

Landon, an obstetrician/gynecologist/specialist in maternal fetal medicine,[13] that if Ms. Heimlicher had sought medical attention earlier, she might have been hospitalized earlier and avoided the problems she faced that evening. *See* Trial Tr. at 542-44. From this evidence, the defendants argue the court should have allowed them to submit evidence of Ms. Heimlicher's alleged comparative fault to the jury. They further argue the court should have submitted jury instructions and a verdict form that would have allowed the jury to consider her fault.

At a pretrial conference on the morning of the first day of trial, the court advised the defendants preliminarily that evidence of Ms. Heimlicher's alleged comparative fault would not be permitted, but they could offer evidence during the trial to persuade the court otherwise. *See* FTR Gold recording of pretrial conference, March 2, 2007, beginning at 08:50:13; Trial Tr. at 537. During the trial, the court excluded the proffered testimony of Dr. Landon, Trial Tr. at 546, and all other evidence offered by the defendants to establish fault on the part of Ms. Heimlicher. In the jury instructions, the court told the jury not to consider Ms. Heimlicher's fault in arriving at their verdict. *See* Doc. No. 119; Trial Tr. at 815-16.

In *DeMoss v. Hamilton*, 644 N.W.2d 302 (Iowa 2002), the Iowa Supreme Court addressed the question of "when, if ever, a patient's fault may be considered by the jury and compared with the alleged fault of the doctor." The court answered this question as follows:

> [A] patient's negligence must have been an active and efficient contributing cause of the injury, must have cooperated with the negligence of the malpractitioner, must have entered into proximate causation of the injury, and must have been an element in the transaction on which the malpractice is based. Accordingly, in a medical malpractice action, the defense of contributory negligence is inapplicable when a patient's conduct provides the occasion for medical attention, care, or

---

[13]*See* Trial Tr. at 452.

treatment which later is the subject of a medical malpractice claim or when the patient's conduct contributes to an illness or condition for which the patient seeks the medical attention, care or treatment on which a subsequent medical malpractice claim is based.

*DeMoss*, 644 N.W.2d at 306; *see id.* at 303-04.

In deciding *DeMoss*, the Iowa Supreme Court relied on *Fritts v. McKinne*, 934 P.2d 371 (Okla. Ct. App. 1996), a case involving a patient who had been seriously injured in a car accident. The defendant emergency room doctor asked for a comparative fault instruction because the patient had been driving drunk. The appellate court found the instruction was not warranted, holding, "Those patients who may have negligently injured themselves are nevertheless entitled to subsequent non-negligent medical treatment and to an undiminished recovery if such subsequent non-negligent treatment is not afforded." *Fritts*, 934 P.2d at 374.

These principles were applied by the Iowa Supreme Court in *Wolbers v. The Finley Hospital*, 673 N.W.2d 728 (Iowa 2003). In *Wolbers*, a patient was scheduled for surgery, and was told to stop smoking in preparation for the surgery. He ignored these instructions, and continued smoking up until the time he entered the hospital. Complications developed after the surgery, and the patient died from breathing complications. His estate brought a malpractice claim against the hospital. The trial court denied the hospital's request to have comparative fault submitted to the jury, and the hospital appealed. The Iowa Supreme Court affirmed, holding, "While it seems clear that smoking can produce increased secretions, such as the ones that caused a blockage to the airways of plaintiff's decedent, it seems equally clear that the present claim was based on the hospital staff's alleged failure to adequately treat the condition that existed, whatever its cause." *Wolbers*, 673 N.W.2d at 733.

Under *DeMoss* and *Wolbers*, the defendants in the present case were not entitled to the submission of comparative fault. All of the evidence proffered by the defendants on

the issue of comparative fault related to Ms. Heimlicher's conduct *before* she arrived at Lakes Hospital. No evidence was proffered to support a claim that *after* Ms. Heimlicher arrived at Lakes Hospital, she acted or failed to act in a manner that contributed to the deterioration of her condition or the loss of the fetus. Even if Ms. Heimlicher delayed in calling "911"or in going to Lakes Hospital, or engaged in activities before admission to Lakes Hospital that contributed to her problems, she was entitled to an "undiminished recovery" for any subsequent acts of malpractice by the defendants. *Fritts*, 934 P.2d at 374.

The defendants cite *Reed v. Lyons*, 752 N.W.2d 453 (Table), 2008 WL 2041686 (Iowa Ct. App. 2008), in support of their argument. In *Reed*, the defendant doctor performed knee surgery on the plaintiff. After surgery, the plaintiff tested negative for infection. Later, the defendant doctor aspirated a large blood clot on the knee, noting in his medical record that there was no sign of infection. The plaintiff later developed an infection in his knee that required hospitalization. He filed suit against the doctor, alleging that negligent medical care provided by the doctor was a proximate cause of the infection. The defendant denied causation, and alleged that the plaintiff's own conduct contributed to the infection. At trial, the defense submitted evidence that on several occasions, the plaintiff had self-aspirated his knee joint. *Reed*, 2008 WL 2041686 at *1. The trial court submitted comparative fault to the jury, and the jury found the plaintiff 90% at fault and returned a defense verdict. The trial court denied the plaintiff's motion for new trial based on submission of comparative fault. The plaintiff appealed, arguing that "a comparative fault defense is inapplicable when a plaintiff's negligence occasioned the currently disputed medical treatment." *Reed*, 2008 WL 2041686 at *2.

The Iowa Court of Appeals analyzed this argument as follows:

> Reed also contends the instruction was improper because even if there was proof Reed self-aspirated his knee before being treated by Dr. Lyons or during his follow-up care with the University of Iowa Hospitals physicians, this negli-

42

gent conduct cannot be used as a defense in a medical malpractice action. The rule is

> in a medical malpractice action, the defense of contributory negligence is inapplicable when a patient's conduct provides the occasion for medical attention, care, or treatment which later is the subject of a medical malpractice claim or when the patient's conduct contributes to an illness or condition for which the patient seeks the medical attention, care or treatment on which a subsequent medical malpractice claim is based.

*Wolbers* [*v. The Finley Hosp.*], 673 N.W.2d [728,] 732 [(Iowa 2003)], (quoting *DeMoss* [*v. Hamilton*], 644 N.W.2d [302,] 306 [(Iowa 2002)]). A patient that is injured by his or her own negligence is still entitled to subsequent non-negligent medical treatment and recovery should not be diminished if negligent medical care is given. *Id.* Reed's argument fails because he has not identified the relevant time period of conduct under this rule. *See DeMoss*, 644 N.W.2d at 306 ("[T]he question is which conduct is relevant to the cause of action.").

> Here defendant Lyons is not arguing Reed's self-aspiration before the surgeries contributed to the infection. Instead, Lyons argues the jury could find from circumstantial evidence Reed self-aspirated after the surgeries and the follow-up appointment, against medical advice, which caused or exacerbated the infection. The court properly submitted the issue of comparative fault to the jury and correctly overruled Reed's motion for a new trial on this ground.

*Reed*, at *4.

The decision in *Reed* does not conflict with the principles announced by the Iowa Supreme Court in *DeMoss* or *Wolbers*, and is easily distinguishable from the present case. In *Reed*, after the defendant doctor began caring for the plaintiff, the plaintiff acted in a manner that allegedly contributed to his damages. No such allegation was made in the present case. Here, the defendants allege that Ms. Heimlicher was at fault "in failing *to seek* medical attention when it was obvious that she should do so." Doc. No 133, § IX(d),

p. 8 (emphasis added). This allegation, even if true, would not constitute comparative fault under Iowa law.

The defendants' motions for new trial on this ground are **denied**.

## G. Did the Court Mislead the Jury into Assigning Lakes Hospital Double Liability?

In its reply brief, Lakes Hospital argues for the first time that "in Instruction No. 17,[14] the jury was misled to believe that the hospital was liable for two errors of medical judgment, that is, its own and that of its emergency room physician. An instruction that erroneously imposes a duty is reversible error and grounds for a new trial where it misleads the jury or had a probable effect on the jury's verdict." Doc. No. 158, p. 2 (citing *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 722 (8th Cir. 2008)). Lakes Hospital then argues the jury was misled by the combination of Jury Instruction No. 16, the "elements" instruction for the plaintiffs' negligence claim against the Hospital, and Jury Instruction No. 17, the instruction explaining when a hospital is liable for the acts of its employees, officers, directors, and agents. *Id.*

Based on the evidence, the jury's assignment of 70% of the fault to Lakes Hospital was to be expected. The most powerful evidence on the question of fault was about the ambulance ride from Lakes Hospital to Sioux Valley Hospital. From the beginning of the ride, it was readily apparent that Ms. Heimlicher and her unborn child were in serious trouble. Ms. Heimlicher was in severe pain and was bleeding profusely. In addition to these distressing symptoms, critical problems were being reflected on the monitors attached to her. The monitor for her uterus indicated she was having contractions that were too rapid, an indication of uterine bleeding. The monitor for the baby's heartbeat

---

[14]In Jury Instruction No. 17, the court explained that a hospital is responsible under the law for the acts or omissions of its employees, officers, directors, and agents performed within the scope of their authority, and under certain circumstances a hospital also may be responsible for the acts or omissions of a doctor, such as an emergency room physician, who is not an employee or agent of the hospital.

demonstrated a pattern of repeated "late decelerations," a serious sign of fetal distress. The Lakes Hospital nurse who was supposed to be monitoring Ms. Heimlicher and her baby failed to notify anyone of these problems or take any steps to address the situation. If she had called Dr. Steele as soon as these problems had become apparent and told him about them, he almost certainly would have ordered the ambulance back to Lakes Hospital for an emergency C–section. Under these circumstances, assignment of 70% of the fault to Lakes Hospital has ample support in this record.

Under the facts of this case, the jury could have been expected to assign Lakes Hospital 100% of the fault based on its vicarious liability for the imputed negligence of its agents and employees. As explained by the Iowa Supreme Court in *Wells Dairy, Inc. v. American Industrial Refrigeration, Inc.*, 762 N.W.2d 463, 471 (Iowa 2009):

> In the vicarious liability cases, the relationship of the indemnitor and the indemnitee is such that fairness and justice requires that the party primarily responsible for the underlying injury should bear the liability. Vicarious liability is commonly used in cases involving respondeat superior, principals and agents, employers and employees, or other similar relationships. We have adopted indemnity based on vicarious liability in Iowa. *Rozmajzl v. Northland Greyhound Lines*, 242 Iowa 1135, 1143, 49 N.W.2d 501, 506 (1951).

*Id.*, 762 N.W.2d at 471. *See Tigges v. City of Ames*, 356 N.W.2d 503, 507 (Iowa 1984) ("Imputed negligence is the negligence of one person which is chargeable to another because of a relationship between the parties, *e.g.*, the negligence of an agent within the scope of his employment is chargeable to the principal."); *Gartin's Grocery v. Lucas County Co-op. Creamery Ass'n*, 231 N.W.2d 275, 280 (Iowa 1941) ("[F]ew doctrines of the law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own.").

The evidence firmly established that all of the actors in this case (Dr. Steele, Nurse Helle, Ms. Evans, and even Dr. Low) were either agents or employees of the Hospital. As such, the Hospital was vicariously liable for the combined total of their fault, which

would be 100%. No party requested that the defendants' fault be submitted together, and that they be treated as a unified tortfeasor. *See, e.g., Peppermeier v. Murphy*, 708 N.W.2d 57, 64 (Iowa 2005) (acts of principal and agent deemed that of one tortfeasor). If Lakes Hospital believes it has been assigned too much of the fault, or that it is entitled to indemnity or contribution from Dr. Steele or from anyone else, it can seek that relief in a separate action. *See Biddle v. Sartori Mem. Hosp.*, 518 N.W.2d 795, 799 (Iowa 1994) (recognizing the "well settled rule that a principal found vicariously liable for the negligent acts of an agent retains a right of full indemnity against the actual tortfeasor"). It is too late to make such a claim here.

The instructions, taken as a whole, do not suggest that Lakes Hospital should be held liable for "double fault" based on the combination of its own negligence and the negligence of the emergency room doctor, and the court finds the jury did not do so. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 252 F.3d 1010, 1012-13 (question is "whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury").

In any event, this objection to Jury Instruction No. 17 was not asserted at trial.[15] In fact, this argument was not even raised in Lakes Hospital's post-trial motions, but was asserted for the first time in its reply brief. This was too late. *See* L.R. 7.g.[16] If Lakes

---

[15]Lakes Hospital objected to Jury Instruction No. 17 as an "expansion of the law of agency," not because it might have misled the jury into assigning Lakes Hospital "double fault" based on the combination of its own negligence and the negligence of the emergency room doctor. *See* FTR Gold recording of instruction conference, March 2, 2007, at 9:07:00. If Lakes Hospital had made this "double fault" objection at trial, the court could have addressed the issue with a further instruction. *See Doyne v. Union Electric Co.*, 953 F.2d 447, 450 (8th Cir. 1992).

[16]In *McGhee v. Pottawattamie County, Iowa*, the court held:

> Defendants raised this argument in the district court for the first time in their summary judgment reply brief. The district court did not consider this argument. *See* S.D. Iowa L.R. 7(g) (A reply brief may be filed 'to assert newly-decided authority or to respond to new and unanticipated arguments made in the resistance [brief].'). . . . The district court did not

(continued...)

Hospital believed there was a risk the jury would assign it "double fault," it should have objected to the instructions on this ground, or it should have requested that Lakes Hospital and Dr. Steele be treated in the instructions as a single defendant for purposes of fault. *See* Iowa Code § 668.3(2)(b). These objections were not raised at trial, so they have been waived. *See* Fed. R. Civ. P. 51(d)(1)(A); *Cincinnati Ins. Co. v. Bluewood, Inc.*, 560 F.3d 798, 805 (8th Cir. 2009); *McGhee v. Pottawattamie County, Iowa*, 547 F.3d 922, 929 (8th Cir. 2008).

       Lakes Hospital's motion for new trial on this ground is **denied**.

## H.    *Did the Court Err in Allowing Plaintiffs' Counsel to Ask Expert Witnesses Questions Based on the Jury Instructions?*

       The defendants argue the court erred when it allowed the plaintiffs' lawyer to show their expert witnesses the court's "elements" instructions, and then ask them to express opinions about the elements. They maintain these opinions were improper and inadmissible, citing *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). They also maintain they were materially prejudiced by this line of examination because it allowed the plaintiffs' experts "to usurp the function of the jury on the central legal issues in the case." Doc. No. 133, p. 7.

       *Southern Pine Helicopters* was an action to recover damages under an insurance policy. In commenting about the way the case was tried, the court observed:

> Our review of this case has been hampered not a little by the way that the parties chose to try it. The evidence took the form, essentially, of a battle of experts opining as to whether

---

[16](...continued)
                abuse its discretion or otherwise commit error by following the court's
                local rule prohibiting new arguments submitted in a reply brief.

547 F.3d 922, 929 (8th Cir. 2008). This court's Local Rules provide, in pertinent part, that "the moving party may, within five court days after a resistance to a motion is served, file a reply brief, not more than five pages in length, to assert newly-decided authority or to respond to new and unanticipated arguments made in the resistance." LR 7.g.

Southern Pine had violated FAA regulations. As we have had occasion to remark before, however, expert testimony on legal matters is not admissible. *See United States v. Klaphake*, 64 F.3d 435, 438-39 (8th Cir. 1995). Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them. *See id.* Here, the parties did not request instructions on the relevant federal legal principles and so the district court gave none.

Of course, industry practice or standards may often be relevant in cases like the present one, and expert or fact testimony on what these are is often admissible. *See Wood v. Minnesota Mining & Mfg.*, 112 F.3d 306, 310 (8th Cir. 1997). But that is not what this case was about. This case was about whether federal law was contravened, and expert opinion as to that was simply inadmissible.

*Southern Pine Helicopters*, 320 F.3d at 439.

Unlike *Southern Pine Helicopters*, in the present case the evidence did not consist primarily of expert witnesses testifying about whether someone violated a law or regulation. In fact, the record contains little, if any, such evidence. Although several expert witnesses did testify at trial, the record contains substantial additional evidence for the jury to consider, including hospital records and testimony by fact witnesses.

During both direct and cross examination of the expert witnesses, the lawyers from both sides asked questions about the elements of the claims. The court sustained objections to certain of these questions, and overruled others. The Federal Rules of Evidence give the court wide latitude to control proceedings so as to "(1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a). A trial court's evidentiary rulings are reviewed under an abuse of discretion standard. *White v. Honeywell, Inc.*, 141 F.3d 1270, 1274 (8th Cir. 1998). An error in admission of evidence is reversible if the ruling affected a substantial right of a party. *See*

Fed. R. Evid. 103(a); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000).

The defendants argue the expert testimony about elements of the claims usurped the function of the jury on the central issues in the case. This argument is unpersuasive. The Eighth Circuit Court of Appeals "has repeatedly held that an expert, as distinguished from a lay witness, may express his opinion on the ultimate jury question." *United States v. Two Eagle*, 318 F.3d 785, 792 (8th Cir. 2003). To the extent the defendants are arguing this testimony was not useful, doubts regarding usefulness generally should be resolved in favor of admissibility. *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998).

Testimony by expert witnesses in this case concerning the elements of the claims or defenses did not result in a miscarriage of justice, nor did it adversely impact the defendants' substantial rights. The defendants' motions for new trial and for judgment as a matter of law on this ground are **denied**.

I.      ***Did the Court Err in Permitting the Jury to Treat Dr. Low
        as an Agent of Lakes Hospital?***

Lakes Hospital argues the court should order a new trial because Lakes Hospital "was prejudiced by the addition of an agency theory of liability against the hospital based on the diagnosis of a radiologist that was not pled in the Complaint." Doc. No. 133, p. 5. Lakes Hospital explains, "Notwithstanding that the alleged negligence of Dr. Low, a radiologist, was not in the case, the Court nonetheless admitted over objection, substantial adverse expert testimony that was critical of Dr. Low that the jury could impute to the hospital under the Court's Instruction No. 17." *Id.*

After Ms. Heimlicher was brought by ambulance to Lakes Hospital, she was examined by Dr. Steele. He ordered an ultrasound examination, which was performed by Tracy Evans, a hospital ultrasound technician. Ms. Evans transmitted the images elec-tronically to Dr. Low, a Minnesota radiologist who was on call that night, and then spoke

with him on the telephone.  When Dr. Steele's deposition was taken on May 7, 2007, he testified he did not know that on the evening in question, the ultrasound images had been reviewed by a radiologist.  Apparently, the lawyers for the parties also were not aware of Dr. Low's involvement.  This information came to light on July 2, 2007, when the lawyers deposed Ms. Evans.  Dr. Low passed away before he could be deposed.

The only record of the conversation between Ms. Evans and Dr. Low is an "Ultrasound Worksheet" containing some contemporaneous notes made by Ms. Evans. *See* Def. Joint Ex. H, attached to this order.  The notes relate to Ms. Heimlicher's medical history, the ultrasound examination, and Ms. Evans's conversation with Dr. Low.  On the worksheet, Ms. Evans noted, "placenta – posterior/fundal," "no previa," "complex looking placenta in LUQ," and "placental lakes seen vs. hemorrhage." *Id*.  At the bottom of the form, she noted, "teleraded to Dr. Low @ 9:30 2/11/04 TE," and next to this language she wrote, "Dx – mass vs. hemorrhage vs. fibroid." *Id*.

Two weeks before trial, on February 17, 2009, the plaintiffs filed a motion for leave to amend their complaint.  Doc. No. 81.  In paragraph 11 of the proposed amended complaint, the plaintiffs alleged, "At 2125 an ultrasound was performed by Tracy Evans, an ultrasound technician employed by [Lakes Hospital], who then allegedly electronically transferred the ultrasound images to Dr. Lowe [sic], an agent and/or ostensible agent of [Lakes Hospital], whose diagnosis included mass vs. hemorrhage vs. fibroid." The motion to amend the complaint was denied.  Doc. No. 82.  In denying the motion, the court advised the plaintiffs' lawyer that the motion was untimely, but he was not precluded from offering evidence concerning Dr. Low at trial.  In the Final Pretrial Order, the plaintiffs listed the following as issue number 4: "Whether Dr. Low was an ostensible agent/apparent authority of the Defendant Hospital for which they are vicariously liable." Doc. No. 102, p. 9.  By the time of trial, there was no question that Dr. Low's agency was "in the case."

Lakes Hospital argues evidence concerning "Dr. Low's agency" should have been excluded from the trial because the claim was not included in the complaint. This argument is unpersuasive. The Federal Rules of Civil Procedure require only that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To comply with this requirement, a claimant need not "set out in detail the facts upon which he bases his claims," but must "'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 998, 152 L. Ed. 2d 1 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). Well before the plaintiffs' belated attempt to amend their complaint, Lakes Hospital had notice that the plaintiffs' evidence would include testimony concerning Dr. Low, and that the plaintiffs would claim he was an agent of Lakes Hospital.

In any event, the evidence in the record suggesting negligence on the part of Dr. Low was not significant. One of the plaintiffs' expert witnesses testified that the ultrasound images reviewed by Dr. Low demonstrated a massive placental abruption. Another testified Dr. Low should have had direct communication with Dr. Steele that evening. This testimony was critical of Dr. Low, but from the evidence, it was unclear what Dr. Low actually said or did not say to Ms. Evans about the ultrasound images that evening.

The court finds that any testimony implying Dr. Low might have been negligent had little, if any, impact at trial. The central focus of the evidence was not on Dr. Low, but on the alleged errors and omissions of Dr. Steele, Ms. Evans, and Nurse Helle. The court finds Lakes Hospital has shown no unfair prejudice from testimony concerning Dr. Low, or from the claim that he was an agent of Lakes Hospital. Lakes Hospital's motion for new trial on this ground is **denied**.

### J. Did the Court Erroneously Allow Evidence of Grief into The Record?

The defendants argue the plaintiffs' lawyer placed "irrelevant and highly prejudicial grief evidence" into the record in contravention of the court's ruling on the defendants' motion in limine.[17]  Doc. No. 133, § IX(a); Doc. No. 136, § I, ¶ 1.

Under Iowa law, the wrongful death of a minor can give rise to two separate causes of action, one on behalf of the minor's estate under Iowa Code Section 611.20,[18] and the other by the minor's parents pursuant to Iowa Rule of Civil Procedure 1.206 ("Rule 1.206").[19]  A cause of action under Section 611.20 is not available to the plaintiffs in this case because the child was stillborn, and a stillborn fetus is not a "person" for purposes of the statute.  *See Heimlicher II*, 2007 WL 2384374, **3-7.  However, the second cause of action, by the minor's parents pursuant to Rule 1.206, is available to the plaintiffs because a stillborn fetus is a "minor child" for purposes of Rule 1.206.  *Dunn v. Rose Way, Inc.*, 333 N.W.2d 830, 832 (Iowa 1983).  A claim pursuant to Rule 1.206 is not for the death of the child, but for the injury to the parents as a consequence of the death of the child.  *See Wardlow v. City of Keokuk*, 190 N.W.2d 439, 443 (Iowa 1971).

In a cause of action under Rule 1.206, a plaintiff is entitled to recover the actual loss of services, companionship, and society resulting from the death of the child.  These damages can be recovered only for the period from the date of the child's death to the date

---

[17]In its ruling on the defendants' motion in limine, the court held, "The plaintiffs and their counsel are not to refer to any of the following in the presence of the jury: (1) elements of damages not recoverable in this action, including pain, suffering, grief, or mental anguish from the loss of the child. . . ."  Doc. No. 103, Order on Motions in Limine, filed February 27, 2009.

[18]"All causes of action shall survive and may be brought notwithstanding the death of the person entitled or liable to the same."  Iowa Code § 611.20.

[19]"A parent, or the parents, may sue for the expense and actual loss of services, companionship and society resulting from injury to or death of a minor child."  Iowa R. App. P. 1.206.

the child would have attained his majority.[20] *See E.L.K. v. Rohlwing*, 760 F. Supp. 144, 145 (N.D. Iowa 1991) ("What appears to be well established, however, is that when a child dies, a parent can recover damages only until the child would have attained his majority."); *Miller v. Wellman Dynamics Corp.*, 419 N.W.2d 380, 383 (Iowa 1988) (recovery restricted to benefits normally accrued during decedent's minority only). A plaintiff in an action under Rule 1.206 is not entitled to recover damages for pain, suffering, grief, or mental anguish from the loss of the child. *Wardlow*, 190 N.W.2d at 448.

The jury in this case was told it could award damages for the reasonable value of past and future loss of services, companionship, and society of the child, less the probable and reasonable expense to the plaintiff of the child's board and maintenance. These are the damages allowed by Rule 1.206. The jury was told that the plaintiffs were not entitled to recover for pain, suffering, grief, or mental anguish from the loss of the child. The jury also was instructed that their judgment must not be exercised arbitrarily or out of sympathy or prejudice for or against the parties.[21]

In *Pagitt v. City of Keokuk*, 206 N.W.2d 700 (Iowa 1973), the Iowa Supreme Court provided some guidance about the evidence that can be offered to prove a claim for loss of services, companionship, and society:

> [T]he trial court charged the jury on damages in the event they found plaintiff entitled to recover. We set out the important part of that instruction:
>
>> The loss of services for each child includes the reasonable value of the loss of companionship and society of each child from the date of his death . . . , until he reached his majority.

---

[20]Iowa has removed the restriction on damages after age 18, *see* Iowa Code § 613.15A, but only with respect to actions filed on or after July 1, 2007.

[21]*See* Jury Instruction No. 22, a copy of which is attached to this ruling.

In this connection, you are further instructed that the damages for loss of services, if any, must be diminished by the probable cost of each child's support and maintenance from the date of the death of each child until each child would have reached his majority.

You are further instructed that in your consideration of damages for loss of services, if any you find, you are to give no consideration for grief, mental anguish or suffering to the Plaintiff by reason of the childrens' death.

In connection with the claim of the Plaintiff for the loss of services of [his children], or one of them, if any you find, you are instructed that the services of a son in the form of companionship and society to his father cannot be measured with precision but you may take into consideration the circumstances of life of [the children], as disclosed by the testimony, including [their] age, health and strength, [their] activities in the household and community, and any other competent evidence which may have a bearing upon the claim of the Plaintiff for the loss of companionship and society, allowing therefor such amount as to you may appear to be fair and reasonable under the circumstances.

The [city] asserts the trial court erred in letting the jury consider the "age, health and strength, activities in the household and community and any other competent evidence which may have a bearing upon the claim of the plaintiff for the loss of companionship and society" in arriving at the damages for loss of services.

* * *

We cannot accept the argument that the characteristics which bear relationship to companionship and society may not be considered in arriving at the value of the loss sustained. The city insists this places a premium on the loss of a "genius" and

discounts the value of an ordinary child or, even worse, that of a mentally or physically handicapped one.

We believe this misconceives the nature of companionship and society. We readily agree a parent may suffer as much or more mental anguish and grief over the death of a handicapped child than over one who has no disability.

However, this is not a factor in the award of damages. These items are specifically excluded. Carefully following the mandate of *Wardlow* [*v. City of Keokuk*, 190 N.W.2d 439 (Iowa 1971)], the trial court told the jury it could not consider "grief, mental anguish or suffering" in assessing damages for loss of companionship and society. *See Wardlow v. City of Keokuk*, *supra*, 190 N.W.2d at 448.

It is unrealistic to say All children furnish the same companionship and society to All parents. The former is defined as an "association as companions; fellowship"; the latter as used in this context means "those with whom one has companionship." The Random House Dictionary (1966).

Quite obviously it is impossible to generalize on the extent to which persons – including parents and children – enjoy each other's companionship and society. This is a highly personal relationship which must of necessity be decided on a case-by-case basis. When it relates to a parent and child, it depends on all the circumstances important in the lives of a Particular parent and a Particular child. It takes into consideration not only the character, age, intelligence, interests and personality of the child but also those same factors as they are possessed, or not possessed, by the parent. After all, it is the parent's loss which is being appraised, and the extent to which he has been deprived of the company of his minor child depends on the ability of the child to offer companionship and society and the ability of the parent to enjoy it.

* * *

We have frequently criticized the abstract statement of legal principles in instructions without affording the jury the assistance necessary to properly apply them to the facts in the particular case before it. *Gibbs v. Wilmeth*, 261 Iowa 1015,

1022, 157 N.W.2d 93, 97 (1968) and citations. By including those factors to which objection is now made (all of which had evidentiary support), the trial court correctly sought to avoid this pitfall. We believe all these elements had a true bearing on loss of companionship and society.

We do not mean to limit instructions in future cases to those same circumstances. Other facts shown by the evidence might well be made part of such an instruction in a given case. Our holding that the instruction presents no reversible error is necessarily limited to the record now before us.

*Pagitt*, 206 N.W.2d at 703-04.

In ruling on objections to testimony offered on the plaintiffs' claimed loss of services, companionship, and society in the present case, the court attempted to recognize the factors set out in *Pagitt*. The plaintiffs were permitted to testify about their own, and each other's, character, intelligence, interests, and personality.[22] They also were permitted to testify about the kind of parents they are, and about the nature of the relationships they have with their other children. All of this evidence was relevant under *Pagitt* to the kind of relationship they likely would have had with the stillborn child.

The court understood that, under Iowa law, damages for pain, suffering, grief, and mental anguish ("grief" damages) were not recoverable, *see Wardlow*, 190 N.W. 2d at 448, and attempted to exclude evidence of these types of damages. "Grief" is a "deep and poignant distress" caused by the loss of a loved one. *Webster's Collegiate Dictionary* 512, 107 (10th ed. 1994). "Companionship" and "society" are, essentially, interchangeable. "Companionship" is "the fellowship existing among companions," and "society" is "companionship or association with one's fellows." *Id.* at 233, 1115. Thus, the plaintiffs were entitled to recover damages caused by the loss of fellowship with the child, but not for the deep and poignant distress caused by the loss. This was not always an easy line to draw.

---

[22]Because the child was stillborn, no evidence could be offered about the personal characteristics of this "Particular child." *See Pagitt*, 206 N.W.2d at 703.

During the trial, the court recognized that precise categorization of the evidence on damages often would be difficult due to the razor-thin distinction between "grief" and "loss of companionship and society." In an effort to protect against mistakes or confusion on this subject, during the trial the court orally instructed the jury as follows:

> First, Mr. and Ms. Heimlicher are the only plaintiffs in this case. Their two children are not parties to the case, nor is the estate of Cole Heimlicher. At the conclusion of the case you will be asked to consider only the claims of Mr. and Ms. Heimlicher for loss of services, companionship, and society of the unborn child, from the date of the child's death until the child would have reached the age of eighteen years. You are not to consider any other claims or items of damage.

> Second, in considering the claims of Mr. and Ms. Heimlicher, you are not to assign any degree of fault to them.

> Third, you are reminded that the plaintiffs are not entitled to recover damages for pain, suffering, grief, or mental anguish from the loss of the child. They also are not entitled to recover damages for the delivery or for recuperation following delivery.

> Finally, damages do not have to be measured by any exact or mathematical standard. However, you must use your sound judgment based upon an impartial consideration of the evidence, and your judgment must not be exercised arbitrarily, or out of sympathy or prejudice for or against any party.

Doc. No. 119; Trial Tr. at 815-16. Later in the trial, immediately after Mr. Heimlicher began to testify about his wife's "grief and remorse," the court interjected:

> Ladies and gentlemen of the jury, it is the law in Iowa you cannot consider grief or remorse. That's not part of this case. And disregard that. I know it is difficult to make a distinction, but that's not part of the case.

Trial Tr. at 832-33.

These cautionary instructions were given to minimize any prejudice from evidence that arguably suggested the plaintiffs were entitled to recover "grief" damages. A

cautionary instruction is "'generally sufficient to alleviate prejudice flowing from improper testimony.'" *United States v. Beltran-Arce*, 415 F.3d 949, 953-54 (8th Cir. 2005) (quoting *United States v. Davidson*, 122 F.3d 531, 538 (8th Cir. 1997)); *see Harrison v. Purdy Bros. Trucking Co., Inc.*, 312 F.3d 346, 353 (8th Cir. 2002) (cautionary instruction was sufficient to cure any prejudice that might have been caused by testimony).

There was no way to hide from the jury the fact that the plaintiffs grieve the loss of their child, or that they have suffered pain and mental anguish from the loss. The jury would have deduced this even if the plaintiffs had not testified. However, the jury was instructed not to consider grief evidence in deciding this case, and there is no reason to believe it disobeyed those instructions. The court is convinced that the cautionary instructions given in this case were sufficient to alleviate any unfair prejudice to the defendants from grief evidence that may inadvertently have been placed before the jury. *See United States v. Davidson*, 122 F.3d 531, 538 (8th Cir. 1997) (trial court is in the best position to weigh the effect of improper testimony). The court finds any evidence of the plaintiffs' grief that found its way into the record did not result in a miscarriage of justice.

The defendants argue the plaintiffs' lawyer intentionally and inappropriately placed grief before the jury, both in the questioning of his clients and in argument. "Misconduct by an attorney that results in prejudice may serve as a basis for a new trial." *In re Air Crash Disaster*, 86 F.3d 498, 524 (6th Cir. 1996) (citing *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980)). "The burden of showing prejudice rests with the party seeking the new trial, and district courts have broad discretion in deciding whether to grant a motion for a new trial." *Id.* (citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S. Ct. 188, 190, 66 L. Ed. 2d 193 (1980)).

The court finds the defendants have failed to sustain this burden. Although the plaintiffs' lawyer made a few stray remarks about grief, and asked questions of his clients that arguably were designed to elicit grief evidence, the court promptly struck those

matters from the record or sustained the defendants' objections to them. These incidents were not so pervasive as to have fatally tainted the trial.

The defendants' motions for new trial and for judgment as a matter of law on this ground are **denied**.

### K.    Did the Court Err in Allowing Photographs of the Fetus into Evidence?

The defendants argue the court abused its discretion by admitting into evidence three photographs of the stillborn baby, Plaintiffs' Exhibits 10-A, 10-B, and 10-C. They claim the photographs "were intended to, and did, induce sympathy and served no countervailing probative purpose." Doc. No 133, § IX(b), p. 7; *see* Doc. No. 133-2, pp. 6-7; Doc. No. 136, § I, ¶ 1.

A week before trial, Dr. Steele filed an amended motion in limine asking the court to exclude from evidence any photographs of the stillborn child. Doc. No. 88. Lakes Hospital joined in the motion. Doc. No. 91. The court granted the motion in part, holding the plaintiffs' lawyer could not show the photographs to the jury without first displaying the photographs to the court and defense counsel outside the presence of the jury and obtaining permission from the court to offer them into evidence. Doc. No. 103. Shortly before trial commenced, the court was provided with copies of the photographs, and ruled that the plaintiffs could offer five of them into evidence.[23]

The photographs all show what appears to be a sleeping, fully-clothed or covered, newborn infant. They are not overly-sentimental, gruesome, or inflammatory. After looking at the photographs, the court believed they were probative on the plaintiffs' claim for loss of companionship. A large part of a parent's companionship with a child, especially in infancy, is simply looking at the child, and these photographs depicted the child at whom the plaintiffs would be looking. The court found that the probative value

---

[23]The plaintiffs offered only three of the photographs into evidence. *See* Pl. Ex. 10.

of the photographs was not substantially outweighed by any unfair prejudice to the defendants. Based on this finding, the court allowed the photographs into evidence.

Relevant evidence may be excluded under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." All evidence is inherently prejudicial. It is only when unfair prejudice substantially outweighs probative value that Rule 403 permits exclusion of relevant evidence. The Advisory Committee Note to Rule 403 states, "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See Block v. R.H. Macy & Co., Inc.*, 712 F.2d 1241, 1244 (8th Cir. 1983).

The admission of photographs is a matter within the discretion of the trial court. *Giblin v. United States*, 523 F.2d 42, 44 (8th Cir. 1976); *United States v. Delay*, 500 F.2d 1360, 1366 (8th Cir. 1974); *see Campbell v. Keystone Aerial Surveys*, 138 F.3d 996, 1004 (5th Cir. 1998) (trial court "has broad discretion in assessing admissibility under Rule 403"). The fact that photographs may be chilling or gruesome does not mean they must be excluded. *Haley v. Gross*, 86 F.3d 630, 645-646 (7th Cir. 1996); *see In re Air Crash Disaster Near New Orleans*, 767 F.2d 1151 (5th Cir. 1985) (district court did not abuse its discretion in admitting photographs of bodies of plane crash victims with third degree burns where conscious pain and suffering was an issue); *United States v. Bowers*, 660 F.2d 527, 529-30 (5th Cir. 1981) (prejudice inherent in color photographs of child's lacerated heart in criminal prosecution for child's death did not substantially outweigh the probative value of the evidence to show cruel and excessive physical force); *United States v. Kaiser*, 545 F.2d 467, 476 (5th Cir. 1977) (admission of photographs of murder scene was not abuse of discretion).

Appellate courts generally have held that when the photographs are probative of a relevant fact, even if not necessarily a disputed one, admission of even gruesome

photographs under Rule 403 is not reversible error. "Gruesomeness alone does not make photographs inadmissible." *United States v. Naranjo*, 710 F.2d 1465, 1468 (10th Cir. 1983). *See, e.g.*, *United States v. Ortiz*, 315 F.3d 873, 897 (8th Cir. 2002) (in capital case, admission of graphic photos of bloody corpse was not abuse of discretion, as they corroborated testimony regarding victim's murder and established that it was heinous and depraved); *United States v. Rezaq*, 134 F.3d 1121, 1138 (D.C. Cir. 1998) (autopsy photographs were relevant to determination of "force and violence" in hijacking case and corroboration of government theory regarding systematic executions); *United States v. Cruz-Kuilan*, 75 F.3d 59, 61 (1st Cir. 1996) (lacerations on victim's head corroborated government theory regarding stray bullets); *State v. Alfieri*, 724 N.E.2d 477 (Ohio Ct. App. 1998) (affirming admission into evidence of photographs of fetus); *State v. Williamson*, 919 S.W.2d 69 (Tenn. Crim. App. 1995) (same); *but see Navarro de Cosme v. Hospital Pavia*, 922 F.2d 926, 931 (1st Cir. 1991) (affirming discretionary exclusion from evidence of "inflammatory," "gruesome" photographs of stillborn fetus in medical malpractice action against doctor and hospital); *Kelly v. Al-Qulali*, 728 N.W.2d 852 (Table), 2007 WL 108462 (Iowa Ct. App. 2007) *(*affirming discretionary exclusion from evidence of photographs of stillborn fetus offered as evidence on loss of consortium claim); *Steele v. Atlanta Maternal-Fetal Medicine, P.C.*, 610 S.E.2d 546, 553-54 (Ga. Ct. App. 2005) (affirming discretionary exclusion of "emotionally provocative" and "inflammatory" photographs of stillborn fetus on grounds that their "slight probative value was substantially outweighed by the danger of unfair prejudice").

Obviously, photographs of a stillborn child could have an emotional impact on almost anyone, including persons sitting on a jury. All evidence concerning the loss of a child is likely to be emotional. However, this is precisely what this case is about – the plaintiffs' loss of companionship and society with their deceased child. The fact that the subject matter of a case is tragic does not mean that a plaintiff is not entitled to present relevant evidence to prove his or her claim. In deciding whether or not to admit such

evidence, the court is required to balance the probative value of the evidence against any unfair prejudice. That is what the court did here.

The court continues to believe the probative value of the three photographs of the stillborn fetus was not substantially outweighed by any unfair prejudice to the defendants. The defendants' motions for new trial on this ground are **denied**.

## L.    *Did the Court Err in Allowing Dr. Leavy to Testify to Matters Outside of His Expert Witness Designation?*

The defendants argue the court admitted previously-undisclosed testimony by the plaintiffs' expert Dr. Phillip Leavy that was "critical of the hospital and its staff." Doc. No 133, § IX(c), p. 8; *see* Doc. No. 136, § I, ¶ 1. They argue, "This testimony was materially prejudicial and should have been excluded pursuant to Federal Rule of Civil Procedure 37(c)(1)." In their brief, they do not specify how Dr. Leavy's testimony fell outside the scope of the plaintiffs' expert witness disclosures or why the defendants were unfairly or materially prejudiced.

The plaintiffs offered Dr. Leavy as an expert in emergency medicine. In his expert report, Dr. Leavy stated he would be giving the following opinions at trial:

> Given Ms. Heimlicher's complaints of excessive bleeding and pain upon arrival to Lakes Regional Healthcare, James O. Steele, M.D., as an emergency room physician, was negligent in failing to properly assess her condition, failing to call in an obstetrician to further evaluation [sic] her condition, and if one was not available, failing to consult with an obstetrician at another facility for guidance, failing to obtain an accurate diagnosis of her condition, including abruptio placenta, failing to order appropriate diagnostic tests, specifically laboratory studies, failing to timely consult with a radiologist to interpret the ultrasound images, failing to administer oxygen therapy, intravenous fluids, and/or blood products to a patient with a large amount of blood loss, and failing to intervene on her behalf by calling in the available medical service, specifically a general surgeon or ob/gyn, in

a timely manner to perform an emergent c-section, and avoid transferring her to another facility while she was unstable.

Had Dr. Steele admitted Ms. Heimlicher and acted in the above manner, this would have alerted the nursing staff and attending physicians to an abruptio placenta, such as the one that lead to the death of [the child], thereby allowing timely medical intervention to save his life.

Doc. No. 117-3, ¶¶ 2 & 3. In the Final Pretrial Order, Doc. No. 102, the scope of his testimony was described as follows:

[Dr. Leavy] will give testimony in a manner consist with his expert report, deposition testimony and the allegations outlined in plaintiff's complaint. Further that Dr. Steele was negligent and deviated from the standard of care by failing to diagnose, and treat a placental abruption; by failing to make arrangements for Mrs. Heimlicher to be promptly delivered at Lakes Regional Healthcare; by allowing Mrs. Heimlicher to be sent to a remote hospital when she was in the midst of a life threatening emergency to wit; placental abruption with non reassuring fetal heart tracings. The standard of care would have required administration of oxygen, IV fluids and blood products depending upon the lab findings. Dr. Leavy will give a more detailed opinion during his trial testimony.

Doc. No. 102, pp. 4-5. In his testimony, Dr. Leavy was critical of both Dr. Steele and Lakes Hospital, as well as its staff.

The defendants cite *Wegener v. Johnson*, 527 F.3d 687, 690 (8th Cir. 2008), as support for their argument. In *Wegener*, the plaintiff attempted to supplement her expert witness disclosures shortly before trial, but the trial court excluded the testimony. The Eighth Circuit Court of Appeals affirmed the trial court's ruling. The court commented that "the exclusion of evidence is a harsh penalty and should be used sparingly," 527 F.3d at 692 (citing *ELCA Enterprises v. Sisco Equipment Rental & Sales*, 53 F.3d 186, 190 (8th Cir.1995)), but found that the trial court had not abused its discretion in excluding the testimony.

The Eighth Circuit has held, "The district court has wide discretion in deciding whether to allow the testimony of witnesses not listed prior to trial, and any such decision will be overturned only if it results in a clear abuse of discretion." *Long v. Cottrell, Inc.*, 265 F.3d 663, 668 (8th Cir. 2001) (citing *Boardman v. Nat'l Med. Enters.*, 106 F.3d 840, 843 (8th Cir. 1997)). "The decision whether to admit evidence is a matter peculiarly within the competence of the trial court and will not be reversed absent a clear abuse of discretion. *U.S. for Use and Benefit of Treat Bros. Co. v. Fidelity& Deposit Co.*, 986 F.2d 1110, 1117 (7th Cir. 1993).

In *Shuck v. CNH America, LLC*, 498 F.3d 868 (8th Cir. 2007), the defendant argued the testimony of an expert witness exceeded the scope of his opinion as disclosed by the plaintiffs under Federal Rule of Civil Procedure 26(a)(2)(B), and the district court should have instructed the jury not to consider certain aspects of the testimony. The Eighth Circuit affirmed the trial court's ruling that allowed testimony not previously disclosed, holding:

> We review the admission of expert testimony and the denial of a motion in limine for abuse of discretion. *United States v. Triplett*, 195 F.3d 990, 998 (8th Cir. 1999); *United States v. Littrell*, 439 F.3d 875, 884 (8th Cir. 2006). Similarly, we review for abuse of discretion a district court's election regarding how to treat evidence that was not disclosed in accordance with Rule 26(a)(2)(B). *Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004) (applying an abuse of discretion standard to a district court's handling of a failure to disclose under Rule 26(a)(1)). Finally, we note that, under Federal Rule of Civil Procedure 37(c)(1), evidence not disclosed under Rule 26(a) is admissible if harmless.

*Shuck*, 498 F.3d at 873-74. *See The Shaw Group, Inc. v. Marcum*, 516 F.3d 1061, 1068 (8th Cir. 2008) (citing *Allied Sys., Ltd. v. Teamsters Transp., Local 604*, 304 F.3d 785, 791 (8th Cir. 2002)).

Most recently, in *Kahle v. Leonard*, ___ F.3d ___, 2009 WL 1109847 (8th Cir., Apr. 27, 2009), the Eighth Circuit affirmed the trial court's admission of a supplemental

expert report that was submitted twelve days prior to trial. A psychologist had examined the plaintiff in 2004, and had authored a report describing the plaintiff's diagnoses. Three weeks prior to trial, in early 2008, the psychologist interviewed the plaintiff again to update the report. He learned the plaintiff expected to be released from prison in two years, and his supplemental report included the estimated cost of her post-incarceration treatment. The defendant argued that because the updated report included new information (the cost estimate), it was not a supplemental report and was untimely.

The trial court allowed the updated report, finding the defendant "was not prejudiced by the disclosure, as the updated report quantified a previous assessment of the need for treatment." *Kahle*, 2009 WL 1109847 at *3. The appellate court held admission of the report was not an abuse of discretion. *Id.* (citing *Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004) ("no abuse of discretion to allow testimony when 'district court reasonably found that there was no unfair surprise' about the topic of testimony"); and *Farmland Indus., Inc. v. Morrison-Quirk Grain Corp.*, 54 F.3d 478, 482 (8th Cir. 1995) ("district court did not abuse its discretion by allowing testimony when opposing party 'was neither surprised nor confused at the substance' of the testimony")).

The underlying principle in these cases is that the trial court has the discretion to admit or exclude such evidence based on the circumstances in each case. Here, a review of Dr. Leavy's trial testimony reveals that some of his responses on direct examination could be viewed as exceeding the scope of his Rule 26 disclosures and the Final Pretrial Order. However, a broader reading of his testimony shows the questions to which the defendants objected were asked to lay a foundation for Dr. Leavy's opinions regarding Dr. Steele's actions. For example, plaintiffs' counsel asked Dr. Leavy questions about the standard of care at a community hospital with regard to a pregnant woman in Ms. Heim-licher's condition. Lakes Hospital's attorney objected on the basis that these questions were beyond the scope of Dr. Leavy's report. However, the questions related to the issue of whether Dr. Steele failed to abide by the appropriate standard of care at a community

hospital in his evaluation and treatment of Ms. Heimlicher. Dr. Steele was an agent of Lakes Hospital, so testimony about his acts and omissions often implicated Lakes Hospital as well, and testimony about Hospital staff often implicated him.

In their briefs, the defendants have not directed the court to a single statement or opinion by Dr. Leavy they claim surprised or prejudiced them. This likely is because much of his testimony was cumulative of evidence provided by the plaintiffs' other expert witnesses. The defendants have failed to show they were materially and unfairly prejudiced by Dr. Leavy's testimony, or that it resulted in a miscarriage of justice. The defendants' motions for new trial and for judgment as a matter of law on this ground are **denied**.

## M. *Did the Plaintiffs Waive Their EMTALA Claim by Not Submitting to the Court Timely Requested Jury Instructions on the Claim?*

Lakes Hospital argues the court should order a new trial because the plaintiffs did not submit timely proposed EMTALA jury instructions to the court as required by the court's pretrial orders. The Hospital argues its rights were "adversely affected by the court's submission of Jury Instruction Nos. 18, 19 and 20."[24] Doc. No. 133, p. 4. The Hospital does not make any showing of how it was adversely affected by the court's submission of these instructions to the jury, nor does it cite any authorities to support this argument.

When a party is ordered to submit proposed jury instructions on a claim but neglects to do so, it remains within the discretion of the trial court to instruct on the claim anyway. *See Siems v. City of Minneapolis*, 560 F.3d 824, 826 (8th Cir. 2009) (sanction for violation of pretrial order within discretion of trial court); *Sentis Group, Inc. v. Shell Oil Co*, 559 F.3d 888, 899 (8th Cir. 2009) (same); *Sellers v. Mineta*, 350 F.3d 706, 711 (8th Cir. 2003) (same).

---

[24]Copies of these instructions are attached to this ruling.

Although the court was not pleased that it was required to draft relatively novel instructions on the plaintiffs' EMTALA claim without suggestions or input from the parties, the court nevertheless did so. The court then gave the parties an opportunity to suggest changes in the instructions and, eventually, to object to them. The court believes substantial justice was accomplished by this process. "There is a strong policy favoring a trial on the merits and against depriving a party of his day in court." *Fox v. Studebaker-Worthington, Inc.*, 516 F.2d 811, 996 (8th Cir. 1975).

Lakes Hospital's motions for new trial and for judgment as a matter of law on this ground are **denied**.

### N. Did the Court Err in Submitting Revised Damages Instructions to the Jury?

The defendants argue a new trial should be granted because the Court erred in giving one damages instruction to the jury at the outset of the case, *see* Doc. No. 111, Instruction No. 22, and then giving the jury a different damages instruction at the end of the case, *see* Doc. No. 126, Instruction No. 22. According to the defendants, "Error occurred because the instructions were inconsistent in substance and in form, [and] were confusing, misleading, and therefore prejudicial." Doc. No. 133, p. 6; *see* Doc. No. 136, § I, ¶ 1.

The court read its instructions to the jury immediately after jury selection. Each juror was given a copy of the jury instructions to follow along as they were read, but the copies were collected by the deputy clerk of court after they were read. As the trial progressed, the court determined that Jury Instruction Nos. 22 and 23, relating to damages, needed to be revised. At the conclusion of the evidence, and immediately before argument, the court advised the jury that Jury Instruction Nos. 22 and 23 had been revised. The court then provided each juror with a revised set of the instructions, and read to the jury revised Instruction Nos. 22 and 23, along with the final jury instruction, Jury

Instruction No. 28, dealing with deliberations. The jurors were allowed to keep their copies of the revised set of instructions for use during deliberations.

The court has broad discretion in formulating jury instructions. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 252 F.3d 1010, 1012-13 (8th Cir. 2001). "[J]ury instructions do not need to be technically perfect or even a model of clarity." *Id*. The question is "whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Id.*; *see Gill v. Maciejewski*, 546 F.3d 557, 564 (8th Cir. 2008); *Mems v. City of St. Paul, Dept. of Fire & Safety Servs.*, 327 F.3d 771, 781 (8th Cir. 2003). The form and language of jury instructions are committed to the sound discretion of the trial court so long as the jury is instructed correctly on the substantive issues in the case. *Gross v. FBL Fin'l Servs., Inc.*, 526 F.3d 356, 363 (8th Cir. 2008). An appellate court reviews a trial court's jury instructions for abuse of discretion, *Warren v. Prejean*, 301 F.3d 893, 900 (8th Cir. 2002), and will only reverse if an instructional error affected the substantial rights of the parties, *Gill*, 546 F.3d at 563-64; *see Gasper v. Wal-Mart Stores, Inc.*, 270 F.3d 1196, 1200 (8th Cir. 2001).

The court fails to see how the jury could have been confused or misled under the circumstances in this case. At the beginning of an eight-day trial, the court read twenty-eight instructions to the jury. At the end of the trial, immediately before argument, the court advised the jurors that two of the instructions had been modified, and the court read the revised instructions to the jury. Each juror was given a complete set of jury instructions containing the two revised instructions to keep throughout deliberations. The revised instructions tracked precisely along with the verdict form, which referenced the revised damages instructions, *see* Doc. No. 130, p. 5, and the verdict form was properly completed by the jury at the conclusion of its deliberations. The defendants have not demonstrated that this procedure confused or misled the jury.

Before reading the revised instructions to the jury, the court provided copies of the revised instructions to the lawyers for the parties, and then asked for objections. Although the lawyers asserted several substantive objections, no objection was made to the court's decision to give revised damages instructions to the jury. In particular, no lawyer complained that this procedure was confusing or misleading. Any objection to this procedure has been waived. *See Cincinnati Ins. Co. v. Bluewood, Inc.*, 560 F.3d 798, 805 (8th Cir. 2009).

The defendants' motions for new trial on this ground are **denied**.

### O.     Did the Court Err in Reading the Instructions to the Jury Before Any Evidence Was Received?

Lakes Hospital argues the court erred in instructing the jury on the law applicable to the case before any evidence was received. Doc. No. 133-2, pp. 2-3. The Hospital argues that "by committing to substantive instructions before any evidence was received, the court cast the die and turned the presentation of the evidence into argument. The prejudicial effect of this practice occurred in this case because the court gave multiple instructions as to the duties of the hospital that likely served as a quantitative basis for the allocation of fault." *Id.*

This objection was not made at any time during the trial, *see* FTR Gold recording of instruction conference, March 2, 2007, beginning at 08:19:41, so it has been waived. *See Cincinnati Ins. Co.*, 560 F.3d at 805. In any event, Federal Rule of Civil Procedure 51(b)(3) provides that the court "may instruct the jury at any time before the jury is discharged." *Cf. Seltzer v. Chesley*, 512 F.2d 1030, 1034 (9th Cir. 1975) ("Federal courts also follow their own rules . . . in the manner and method of giving instructions to the jury.").

No argument or authority has been cited by the defendants to suggest that the court committed error in instructing the jury at the beginning of the case. The defendants' motions for new trial on this ground are **denied**.

P.     *Did the Court Err in Not Granting the Various Motions for Mistrial Asserted by the Defendants Throughout the Trial?*

The defendants asserted numerous motions for mistrial throughout the trial, all of which were denied. In his motion for new trial, Dr. Steele claims that "[m]isconduct and irregularity in the proceedings of the prevailing party, as set forth in each motion for mistrial made by Defendant during the trial, prevented the defendant from having a fair trial." Doc. No. 136, § I, ¶ 4. Lakes Hospital joins in this motion. Doc. No. 133, § XIII. In their post-trial motions, neither defendant has cited to any particular motion for mistrial, nor has the court been provided with any new argument or authorities in support of the mistrial motions.

The defendants moved for mistrial a total of ten times, with the nonmoving defendant joining in every motion. Three of the motions for mistrial were based, at least in part, on claims that "grief" evidence was improperly presented to the jury. *See* Trial Tr. 3-4, 833-37, 1743-44. The grief evidence issue was addressed in Section IV.J. of this ruling, *supra*, but the court will address these motions for mistrial separately.

The first motion for mistrial based on the introduction of grief evidence was asserted during voir dire examination, after the plaintiffs' lawyer asked the prospective jurors questions relating to grief damages. Voir dire proceedings have not been transcribed, but the court recalls sustaining objections to these questions, and promptly instructing the panel that they were not to consider grief damages. In the motion, the defendants argue they were entitled to a mistrial because the plaintiffs' lawyer had "rung the bell" by mentioning grief damages, and the bell could not be "unrung." Trial Tr. 4-5. The second such motion was asserted during testimony by Mr. Heimlicher about his wife's "grief and

remorse." As discussed previously in this ruling, *see* Section IV.J., *supra*, the court immediately admonished the jury not to consider this evidence. Trial Tr. 832-33.[25] The third such motion was during closing arguments, when the plaintiffs' counsel read to the jury part of a poem about the loss of a child. Trial Tr. 1743-44. The court denied these three motions for mistrial, ruling in the first two instances that the court's prompt admonition was sufficient to avoid any prejudice, and in the third instance that the argument was not improper.

As discussed in Section IV.J. of this ruling, *supra*, the jury was instructed clearly and specifically not to award grief damages. There is no evidence to show the jury did not follow these instructions. The court finds the defendants were not unfairly prejudiced in any of these three instances.

The defendants also moved for mistrial during voir dire based on the plaintiffs' counsel's alleged violation of the "Golden Rule." Trial Tr. 4-5. The "Golden Rule" prohibits arguments which ask jurors to place themselves in the position of a party. The rule "is universally condemned because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *Lovett ex rel. Lovett v. Union Pac. R.R. Co.*, 201 F.3d 1074, 1083 (8th Cir. 2000).

The court recalls that the plaintiffs' counsel asked the prospective jurors what they thought would be a fair amount of money in a case like this, and then asked how they might feel if they lost a child. The court recalls that the questions were general in nature, and did not purport to reflect the actual facts of this case. The court also recalls that to the extent proper objections were made to the questions, the objections were sustained.

---

[25]The plaintiffs' attorney asked the question of Mr. Heimlicher, "How has [your wife] experienced the society – loss of society and companionship of [the child] from your observations as her spouse?" Mr. Heimlicher began to respond by stating," Obviously, from my standpoint, it's been a – it's been, you know, obviously very difficult on us without him. Her – her grief and remorse and – . . . ." The plaintiffs' attorney immediately broke in to clarify that he was "talking about companionship and society," and the court admonished the jury not to consider grief or remorse. Trial Tr. at 832-33.

Questions asked during voir dire are not argument, so the "Golden Rule" arguably did not even apply. *See* Jury Instruction No. 6 ("Statements, arguments, questions, and comments by the lawyers [are not evidence].").  To the extent the "Golden Rule" did apply, the defendants were not unfairly prejudiced by the plaintiffs' counsel's voir dire questions.

Near the end of his final argument, the plaintiffs' counsel stated, "And I don't think two million dollars is at all out of the question.  But you, ladies and gentlemen, decide what you think is appropriate.  What would it be if it were one of their children [referring to defense counsel] taken because of malpractice?"  Trial Tr. 1742-43.  The court immediately struck the last remark, and directed the jury to disregard it.  Trial Tr. 1743.  The defendants moved for mistrial based on this remark.[26]  *Id.*  The remark was inappropriate, and was stricken promptly by the court.  The court finds there was no prejudice to the defendants from the remark.

The defendants moved for mistrial because the plaintiffs' counsel used the names of the defense attorneys in framing questions to witnesses concerning what the attorneys had said during their opening statements.  The court sustained objections to these questions, and when counsel continued with this practice, the court directed him to stop.  Trial Tr. 646-47, 664-65, 670-72.  The court finds there was no prejudice to the defendants from these incidents.

The next motion for mistrial was based on the argument that Dr. Leavy testified about matters that had not been disclosed in his Rule 26 report.  This argument was addressed in Section IV.L. of this ruling, *supra*.

Two more motions for mistrial were made during Mr. Heimlicher's testimony.  At one point, he testified that one of their children suffered from cystic fibrosis.  His counsel then asked him to tell the jury about cystic fibrosis.  There were no objections to the

---

[26]Actually, the lawyers asked to "reserve a motion," but neglected to assert a motion later.  *See* Trial Tr. 1743.  Nevertheless, the court will treat this matter as if a motion for mistrial had been asserted.

question. Trial Tr. 818. After Mr. Heimlicher testified that the child had an uncertain prognosis, Lakes Hospital's attorney objected, and the objection was sustained. *Id*. No motion to strike was asserted, but counsel asked to "reserve a motion later." *Id*. At another point in Mr. Heimlicher's testimony, he stated his two children were excited when Ms. Heimlicher was expecting, and "they always used to kiss [Ms. Heimlicher's] belly." Trial Tr. 792. After this testimony, Lakes Hospital's lawyer stated he was "reserv[ing] the motion." *Id*. At the recess, both defense counsel moved for mistrial based on these two answers by Mr. Heimlicher. Trial Tr. 798, 809, 828. The court denied the motions, and the following morning gave the jury a cautionary instruction. Doc. No. 119; Trial Tr. 815-16. The court finds that the cautionary instruction prevented any prejudice to the defendants from Mr. Heimlicher's responses.

Later in the testimony of Mr. Heimlicher, his counsel asked, "Is there any amount of money that to you would replace [the child] in your life?" Trial Tr. 834. Lakes Hospital's attorney objected to the question, and the objection was sustained. *Id*. Motions for mistrial were asserted based on this unanswered question, and the motions were denied. Trial Tr. 835-36. The jury was instructed at the beginning of the trial that questions by the lawyers were not evidence. Jury Instruction No. 6. The court finds the defendants were not prejudiced by this question.

The final motion for mistrial was asserted during the plaintiffs' attorney's final argument. *See* Trial Tr. 1738. The attorney made the following statements:

> Where would the average American citizen be in the civil justice if they didn't have the ability to hire an attorney who could hire experts to present their case for them? You would be disenfranchised, you would be out of court, and that's what they want because they don't want accountability.

Trial Tr. 1737. The court immediately struck the last remark. *Id*.

In their motions for mistrial, defense counsel asserted that this remark was "obviously a reference to insurance." Trial Tr. 1738. Of course, any such reference

would have been improper. *See, e.g., Halladay v. Verschoor*, 381 F.2d 100, 112 (8th Cir. 1967) ("Under the general rule, the fact that [a party] is protected by insurance or other indemnity cannot be shown.") (citing, *inter alia*, *Kester v. Travelers Indem. Co.*, 257 Iowa 1146, 136 N.W.2d 261, 264 (1965)). The court denied the motions, finding that the remark, while inappropriate, was not a reference to insurance, and would not have been construed as such by the jury. Instead, the court found that the remark was an ill-advised attempt at responding to attacks on the plaintiffs' expert witnesses, which was the primary focus of the defense attorneys' closing arguments.

The attorney for Dr. Steele stated the following during his closing argument:

> I don't care if we're talking about plaintiff's experts, defendant's experts, any experts, *it is, ladies and gentlemen, a huge industry*. The experts that the plaintiff called in this case – and they are [plaintiffs' counsel's] celebrity A-team of experts, have worked for him collectively, between the experts he called, in over 100 cases. *We're talking about huge money. And we're not just talking about [plaintiffs' attorney] using these people in case after case after case. We're talking about them being used by lawyers everywhere, 40 some states. It's huge money.* Could you question the plaintiffs' experts with those credentials? Well, did you think to yourself at any point in time, wow, I mean these people have testified a bunch for [plaintiffs' attorney]. He seems to use them a lot. He's paying them a lot of money. Is that the way it works? I mean we haven't been jurors. *Is that the way it works? Oh, yeah. Oh, yeah, that's the way it works, if you let it. If you let it work that way, that's exactly the way it works.*

Trial Tr. 1676-67 (emphasis added).

The attorney for Lakes Hospital stated the following during his closing argument:

> I want you to reflect on every witness for the plaintiff who rolled into Sioux City and gave their testimony. Every one of them, *every one of them is a frequent flier*. And if the suggestion that *they're professional witnesses* is extreme, place that blame on me, but reflect on the fact that some of these

> people make well in excess of $125,000 a year coming in here
> and telling you these things.

Trial Tr. 1695-96 (emphasis added).

> And I started to tell you a little bit about my recollection of
> what these individuals said, these experts, these people who go
> from courthouse to courthouse, in case after case after case,
> with the same attorney, same types of cases, and they put on
> their evidence. And when they leave here from Sioux City,
> when they leave here last week, this week, they're going to
> show up in another place down the road, the same team,
> making the same objections, making the same testimony,
> making the same amount of money. *It's an industry. It's an
> industry of people out there that are trying to take away the
> ability for jurors like you to establish what is the appropriate
> standard of care by invoking their opinions, based on money,
> based on their experiences in the courtroom.*

Trial Tr. 1698 (emphasis added).

> But you should really question what's that all about? Is that
> part of this *subindustry* out there that we have now seen and
> learned that is involved in cases like this?

Trial Tr. 1702 (emphasis added).

While the plaintiffs' attorney's remark was inappropriate, it was obvious to the court that it was in response to the argument by the defendants' attorneys that the plaintiff's experts were part of an "industry," and not an improper insertion of insurance into the case.

Finally, the defendants argue that the errors raised in the mistrial motions, cumulatively if not individually, resulted in an unfair trial. Even when individual errors are deemed harmless, their cumulative effect may result in an unfair trial. *See United States v. Eizember*, 485 F.3d 400, 405 (8th Cir. 2007). "Evidentiary errors affect a party's substantial rights when the cumulative effect of the errors is to substantially influence the jury's verdict." *Williams v. City of Kansas City, Mo.*, 223 F.3d 749, 755 (8th Cir. 2000) (citing *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 889 (8th Cir. 1998)).

However, a "'[c]umulative-error analysis should evaluate only the effect of matter determined to be in error, not the cumulative effect of non-errors.'" *United States v. Vining*, 224 Fed. Appx. 487, 498 (6th Cir. 2007) (quoting *McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995) (unpublished case), in turn quoting *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990)). This is especially true here, where many of the defendants' claims of error border on the frivolous.

The court finds that none of the matters raised in the defendants' multiple motions for mistrial, either separately or in combination, affected the defendants' substantial rights or resulted in a miscarriage of justice. *See Littleton v. McNeely*, 562 F.3d 880, 888 (8th Cir. 2009) (even if court's evidentiary rulings were abuse of discretion, any error must affect a party's substantial rights to warrant new trial). The motions for mistrial were denied properly during the trial, and the defendants' motions for new trial and for judgment as a matter of law on these grounds are **denied**.

## Q. *Was the Verdict Irrational, Arbitrary, Excessive, or Unjust?*

The jury awarded the plaintiffs a total of $1,710,000 in damages for loss of parental consortium. The defendants argue this amount "is so excessive that it manifests an arbitrary verdict based on sympathy and grief and mental anguish for loss of a child, in contravention of Jury Instruction No. 22." Doc. No. 134, ¶ 1. They also contend the verdict was irrational, arbitrary, excessive, and unjust. Doc. No. 133, §§ X, XI, & XII; Doc. No. 134; Doc. No. 136, § I, ¶ 1; Doc. No. 136–2, pp. 1–3; Doc. No. 139. The plaintiffs disagree.

The defendants specifically challenge four components of the verdict: (a) the award of $500,000 for past loss of companionship and society ($300,000 to Ms. Heimlicher and $200,000 to Mr. Heimlicher); (b) the deduction of only $10,000 for past expenses attributable to raising the child ($6,000 for Ms. Heimlicher and $4,000 for Mr. Heim-licher); (c) the award of $1,300,000 for future loss of services, companionship, and

society, from the date of the verdict until the child would have reached the age of eighteen ($780,000 to Ms. Heimlicher and $520,000 to Mr. Heimlicher); and (d) the deduction of only $100,000 for future expenses attributable to raising the child ($60,000 for Ms. Heimlicher and $40,000 for Mr. Heimlicher). *Id.*, ¶ 1(A)-(D).

The court first must determine whether state or federal law controls this issue. The court has jurisdiction in this case because the plaintiffs' EMTALA claims present a federal question. 28 U.S.C. § 1331. EMTALA provides that damages for violation of the Act are "those damages available for personal injury under the law of the State in which the hospital is located[.]" EMTALA § (d)(2)(A). Therefore, Iowa law applies to the plaintiffs' damages claim under EMTALA. Damages for the state-law negligence claims also are determined by Iowa law. Thus, Iowa law provides the rules for determining damages for all of the plaintiffs' claims in this case. "In cases in which the federal rule for determining damages is furnished by state law, . . . the federal rule for determining excessiveness [of a jury award] is also furnished by state law." *E.T. Holdings, Inc. v. Amoco Oil Co.*, 1998 WL 34113907 at *15 (N.D. Iowa, Dec. 27, 1998) (Melloy, C.J.) (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996); *Johnson v. Cowell Steel Structures, Inc.*, 991 F.2d 474, 477 (8th Cir. 1993); 12 Moore's Federal Practice § 59.13[2][g][iii][C] (3d ed. 1998)). Accordingly, Iowa law controls the issue of whether the jury's verdict was excessive.

In *Triplett v. McCourt Manufacturing Corp.*, 742 N.W.2d 600 (Iowa Ct. App. 2007), the court explained the test for reviewing a jury verdict under Iowa law:

> Because fixing the amount of damages is a function for the jury, we are "loath to interfere with a jury verdict." *Sallis v. Lamansky*, 420 N.W.2d 795, 799 (Iowa 1988). In considering a contention that the jury verdict is excessive, the evidence must be viewed in the light most favorable to the plaintiff. *Id.* The verdict must not be set aside merely because the reviewing court would have reached a different conclusion. *Id.* When considering a remittitur, we will reduce or set aside a jury award only if it is: (1) flagrantly excessive or

> inadequate; (2) so out of reason as to shock the conscience; (3) a result of passion, prejudice, or other ulterior motive; or (4) lacking in evidentiary support. *Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 869 (Iowa 1994). If a verdict meets this standard or fails to do substantial justice between the parties, the district court must grant a new trial or enter a remittitur. *Id.*

*Triplett*, 742 N.W.2d at 602-03. *See Shehata v. Landau*, 759 N.W.2d 812 (Table), 2008 WL 4725150 at * 3 (Iowa Ct. App. 2008) (same). The court must "consider whether the verdict is so excessive as to raise a presumption that it was motivated by passion or prejudice on the part of the jury." *WSH Properties, L.L.C. v. Daniels*, 761 N.W.2d 45, 50 (Iowa 2008). "[A] flagrantly excessive verdict raises a presumption that it is the product of passion or prejudice." *Id.* (citations omitted). However, "not every excessive verdict results from passion or prejudice." *Id.* (citing *Miller v. Town of Ankeny*, 253 Iowa 1055, 1063, 114 N.W.2d 910, 915 (1962); *Curnett v. Wolf*, 244 Iowa 683, 689, 57 N.W.2d 915, 919 (1953); *accord* 58 Am. Jur. 2d *New Trial* § 313, at 313 (2002) ("[T]he fact that a damage award is large does not in itself . . . indicate that the jury was motivated by improper considerations in arriving at the award.").

The trial court "'has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and . . . knows the community and its standards.'" *St. John v. United States*, 240 F.3d 671, 678 (8th Cir. 2001) (quoting *Solomon Dehydrating Co. v. Guyton*, 294 F.2d 439, 447 (8th Cir. 1961)); *accord McCabe v. Mais*, 602 F. Supp. 2d 1025, 1030 (N.D. Iowa 2008). Therefore, a trial court's assessment of a damages award is reviewed for abuse of discretion under a deferential standard, "unless there is plain injustice or a monstrous or shocking result." *Id.* (internal quotation marks omitted) (citing *Solomon Dehydrating Co.*, 492 F.2d at 448; *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 434-35, 116 S. Ct. 2211, 2223, 135 L. Ed. 2d 659 (1996)); *see also Jasper v. H. Nizam, Inc.*, ___ N.W.2d ___, ___, 2009 WL 151568 at * 16 (Iowa, Jan. 23, 2009).

The defendants assert that "[i]n substance the jury was asked to quantify the immeasurable." Doc. No. 134, ¶ 2. In principle, the court agrees with this assertion. "[T]he assessment of damages is especially within the jury's sound discretion when the jury must determine how to compensate an individual for an injury not easily calculable in economic terms." *Stafford v. Neurological Med., Inc.*, 811 F.2d 470, 475 (8th Cir. 1987); *see E.E.O.C. v. Convergys Customer Mgmt. Group, Inc.*, 491 F.3d 790, 798 (8th Cir. 2007) (same).

The jury was, however, presented with evidence from which it could determine the amount of the Heimlicher's damages. The Heimlichers testified about their relationships with their other children, and about their plans for interacting with the deceased child. They also testified about their own background, interests, and personalities. This testimony provided the jury with important evidence regarding what the Heimlichers' relationship likely would have been with their deceased son. *See Pagitt*, 206 N.W.2d at 703-04.

The plaintiffs did not offer any evidence on the past or future expenses for the child's board or maintenance, but this is not fatal to their claims. In *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7 (Iowa 1977), the Iowa Supreme Court affirmed an award of damages for the loss of services, companionship, and society of a child even though no evidence was presented by either the plaintiffs or the defendant on the cost of raising the child. The court reasoned as follows:

> The first question for consideration is whether plaintiffs should be barred from receiving any award for loss of services where no evidence appears in the record as to the cost of maintaining decedent through his minority. The present value of such costs are to be deducted from recovery, but does a plaintiff have an affirmative duty to present evidence of such costs and can a defendant fail to present such evidence himself and still object on this ground on appeal? Other jurisdictions have considered this question and concluded that absence of evidence as to the cost of maintenance does not bar recovery for loss of services.

[Citations omitted.] We hold the following language to be controlling, from *Smyth v. Hertz Driv-Ur-Self Stations, Inc.*, [93 S.W.2d 56,] 60 [(Mo. Ct. App. 1936)]:

> Appellant also complains of the fact that there was no evidence from which the jury might have estimated the cost of the support of plaintiffs' minor son until he would have attained his majority, and consequently urges that for want of such evidence the instruction served to give the jury a roving commission to assess such damages as they might see fit without proper regard to the compensatory nature of the award. In other words, while conceding, as it must, that the basis laid down for the assessment of damages was correct (*Oliver v. Morgan* (Mo.), 73 S.W.2d 993), it complains of the lack of evidence to have enabled the jury to make application of the measure of damages announced in the instruction, and insists not only that the burden was upon plaintiffs to have furnished proof affording a reasonable basis for the jury's finding, but also that such proof was of a character to have been capable of reasonable ascertainment.
>
> We do not believe that there is any merit to this contention. Obviously there could have been no accurate proof of what it would have cost to have supported plaintiffs' son until he would have reached his majority. In the very nature of things this element of the case was problematical, depending upon circumstances which no one could have foreseen with absolute certainty. Plaintiffs might indeed have attempted to estimate such cost, but for that matter, so could the jurors themselves, who are presumed to have been reasonable men, acquainted with the ordinary affairs of life, and doubtless as well informed as plaintiffs themselves regarding the expenses reasonably incident to the support of a

boy of the age of the deceased. Furthermore it
is to be borne in mind that though this feature of
the case was one which was calculated only to
reduce the damages, appellant nevertheless made
no attempt to make any showing upon it. . . .

\* \* \*

A jury is in a better position than a court to take on the
difficult task of placing a dollar amount o[n] the loss of
services, companionship, and society of a child.  The verdict
in this case, although large, does not shock the conscience or
go beyond the bounds of the evidence.  We are not willing to
disturb the finding of the jury.

*Haumersen*, 257 N.W.2d at 17-19.

The jury awarded $300,000 to Ms. Heimlicher and $200,000 to Mr. Heimlicher for

past loss of consortium during the five years prior to the date of the verdict.  This breaks

down to $60,000 per year for Ms. Heimlicher and $40,000 per year for Mr. Heimlicher.

The jury further awarded $780,000 to Ms. Heimlicher and $520,000 to Mr. Heimlicher

for future loss of consortium.  The jury used the same per-year figures to reach these

amounts; i.e., $60,000 per year for Ms. Heimlicher and $40,000 per year for Mr. Heim-

licher.

A parent's relationship with a child is perhaps the most special relationship that

exists between human beings.  Parents delight in their children's first words, first steps,

and first day at school.  They share the joys and woes of their children's successes and

failures in school, sports, and relationships, and hold their breath as their children learn

to drive, fall in love, and go off to school or work.  The dollar value of these experiences

is, as the defendants point out, almost immeasurable.  The court agrees with the

*Haumersen* court's analysis that the jury is in a better position than a court to take on this

difficult task.  The court finds the amount awarded to the Heimlichers for past and future

loss of consortium was not "so excessive as to raise a presumption that it was motivated

by passion or prejudice on the part of the jury." *WSH Properties, L.L.C. v. Daniels*, 761 N.W.2d 45, 50 (Iowa 2008).

However, the jury's determination of past and future costs of raising the child is not supported by the record. The jury deducted $10,000 ($6,000 assessed to Ms. Heimlicher and $4,000 to Mr. Heimlicher) for the child's board and maintenance for the five years preceding the date of the verdict, and $100,000 ($60,000 assessed to Ms. Heimlicher and $40,000 to Mr. Heimlicher) for the child's board and maintenance for the thirteen years from the date of the verdict until the child would have reached his majority. These figures represent 10% of each award of damages. For the five years preceding the trial, the $10,000 deduction amounts to only $2,000 per year as the cost of raising the child. This is far below what would be a reasonable annual cost to raise a child. Similarly, for the thirteen years from the date of the verdict to the child's majority, the $100,000 deduction amounts to only $7,692.31 per year to raise the child. Although more reasonable than $2,000 per year, the court again finds this amount is far below what would be the expected reasonable annual cost to raise a child from age five years to age eighteen years.

The court does not believe the jury was acting out of passion or prejudice when it underestimated the deductions for past and future expenses to raise the child. Instead, it appears the jury calculated these deductions by simply taking a flat percentage of the damages. This process resulted in deductions that were too low. It also resulted in a disproportionate share of the costs being assigned to Ms. Heimlicher instead of Mr. Heimlicher.[27] Because the award of damages to Ms. Heimlicher was larger, the jury assigned to her a larger percentage of the expenses. The jury made these mistakes because it calculated the expenses "arbitrarily," in contravention of Jury Instruction No. 22.

Under these circumstances, the court may grant the defendants a new trial, or the court may "conditionally grant a motion for new trial but allow plaintiff[s] to avoid a new

---

[27]Mr. Heimlicher operates a business, while Ms. Heimlicher is a stay-at-home mother, so Mr. Heimlicher should have been held responsible for the greater share of these costs.

trial if plaintiff[s] agree[] to remit an amount of damages as determined by the Court." *Shepard v. Wapello County, Iowa*, 303 F. Supp. 2d 1004, 1024 (S.D. Iowa 2003) (citing *Hetzel v. Prince William County, Va.*, 523 U.S. 208, 211, 118 S. Ct. 1210, 1211, 140 L. Ed. 2d 336 (1998); *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 648-49, 97 S. Ct. 835, 836, 51 L. Ed. 2d 112 (1977); *Thorne v. Welk Investment, Inc.*, 197 F.3d 1205, 1212 (8th Cir. 1999)).

The court has decided remittitur is appropriate in this case. Although consideration of whether the damages award was excessive was based on Iowa state law, "[a] decision to grant remittitur 'is a procedural matter governed by federal, rather than state law.'" *Taylor v. Otter Tail Corp.*, 484 F.3d 1016, 1018-19 (8th Cir. 2007) (quoting *Parsons v. First Investors Corp.*, 122 F.3d 525, 528 (8th Cir. 1997)). A trial court's grant of remittitur is reversed only "'for a manifest abuse of discretion,'" *id.*, 484 F.3d at 1019 (quoting *Peoples Bank & Trust Co. v. Globe Int'l Publishing, Inc.*, 978 F.2d 1065, 1070 (8th Cir. 1992)), based on "whether the remittitur was ordered for an amount less than the jury could reasonably find." *Id.* (quoting *Slatton v. Martin K. Eby Constr. Co.*, 506 F.2d 505, 508-09 (8th Cir. 1974)).

In their testimony, the plaintiffs described an active lifestyle and an upscale standard of living. The court has some idea of what the reasonable costs would be to raise a child in such an environment. For general reference, the court has looked at estimates provided by the United States Department of Agriculture for the costs of raising children. For a third child raised in a household located in the Midwest, which includes Iowa, the expected annual cost to raise the child is $11,673.[28] This amount takes into consideration the costs of housing, food, transportation, clothing, health care, child care and education, and other miscellaneous expenses.

---

[28]This figure was obtained using a calculator provided by the USDA as part of its 2007 report, "Expenditures on Children by Families." Although the figures are based on 2007 data, they are adequate for the court's purposes. *See* http://www.cnpp.usda.gov/ExpendituresonChildrenbyFamilies.htm.

The court finds that the appropriate deduction for the past costs of raising the child is $70,000, of which the court allocates $28,000 to Ms. Heimlicher and $42,000 to Mr. Heimlicher. The court finds that the appropriate deduction for the future costs of raising the child is $200,000, of which the court allocates $80,000 to Ms. Heimlicher and $120,000 to Mr. Heimlicher.

In the jury verdict, Ms. Heimlicher was awarded net past damages of $294,000[29] and net future damages of $732,000,[30] for a total of $1,026,000. Mr. Heimlicher was awarded net past damages of $196,000[31] and net future damages of $488,000,[32] for a total of $684,000. This accounts for the total of $1,710,000 in damages awarded by the jury. Adjusting these calculations to reflect the increased costs of raising the child determined by the court, Ms. Heimlicher should have been awarded net past damages of $272,000[33] and net future damages of $712,000,[34] for a total of $984,000. Mr. Heimlicher should have been awarded net past damages of $158,000[35] and net future damages of $408,000,[36] for a total of $566,000. This would have the effect of reducing the total net damages awarded to the plaintiffs by $160,000, from $1,710,000 to $1,550,000.

Accordingly, the defendants' motions for new trial on the ground that the jury's verdict was excessive are **conditionally granted**. However, the court finds the issue of the amount of damages is distinct and separable from the liability issues, such that a new

---

[29] $300,000 - $6,000 = $294,000.

[30] $792,000 - $60,000 = $732,000.

[31] $200,000 - $4,000 = $196,000.

[32] $528,000 - $40,000 = $488,000.

[33] $300,000 - $28,000 = $272,000.

[34] $792,000 - $80,000 = $712,000.

[35] $200,000 - $42,000 = $158,000.

[36] $528,000 - $120,000 = $408,000.

trial solely on the issue of damages may be had without injustice. Thus, a new trial, if one is had, will be limited to the issue of damages. *See Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 499, 51 S. Ct. 513, 515, 75 L. Ed. 1188 (1931); *Burke v. Deere & Co.*, 6 F.3d 497, 513 (8th Cir. 1993).

The plaintiffs may avoid a new trial by consenting to a remittitur of damages in the following amounts: **Ms. Heimlicher must remit $22,000 for past damages** and **$20,000 for future damages**. **Mr. Heimlicher must remit $38,000 for past damages** and **$80,000 for future damages**. **By May 25, 2009**, the plaintiffs must file a notice in this case advising the court and the defendants as to whether they will consent to or reject the entry of a remittitur order.[37] The court **reserves ruling** on the defendants' motions to amend judgment, **Doc. Nos. 134 & 139**, pending the plaintiffs' decision on remittitur.

## V. CONCLUSION

For the reasons stated, the court **conditionally grants** the defendants' motions for new trial, **Doc. Nos. 133 & 136 (in part)**; **reserves ruling** on the defendants' motions to amend judgment, **Doc. Nos. 134 & 139**; and **denies** the defendants' motions for judgment as a matter of law, **Doc. Nos. 132 & 136 (in part)**.[38]

**IT IS SO ORDERED.**

**DATED** this 14th day of May, 2009.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[37] "[A] plaintiff cannot appeal the propriety of a remittitur order to which he has agreed." *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 649, 97 S. Ct. 835, 836, 51 L. Ed. 2d 112 (1977) (citations omitted).

[38] Doc. No. 136 is a combined motion for new trial and renewed motion for judgment as a matter of law. To the extent it is a motion for new trial, it is conditionally granted. To the extent it is a motion for judgment as a matter of law, it is denied.

# APPENDIX

## DEFENDANTS' JOINT EXHIBIT H

---

2·11·04

Heimlicher, Laura

65312

12·1·70
33 y/o

34 week pregnancy — vaginal bleeding
water broke

ER — Steele — Dr. is in Sioux Falls

---

placenta — posterior/fundal
no previa

HR —        150 bpm

AFI —        101 mm

position — head down face up

— complex looking placenta in LUQ
placental lakes seen   no hemorrhage

EXHIBIT
2
ds 7/2/07

DX-
→ Mass vs. hemorrhage
vs fibroid

Televated
to Dr. Low
@ 9:30
2/11/04
TE

DEFENDANTS'
JOINT EXHIBIT
H

Tracy Evans
RDMS RVT

**LAKES REGIONAL HEALTHCARE**
SPIRIT LAKE, IOWA

HEIMLICHER, LAURA
298230  M000  033Y  SPIRIT LAKE
RAM-OUT OF TOWN            12/01/19
ATT-STEELE, JAMES O       M/R  1026

## *CONSENT FOR TRANSFER*

### Section I: (To be completed by physician)

☐ A. This patient has been examined and does not suffer from an emergency medical condition nor is in labor and can be transferred without any expected deterioration in condition.

☑ B. This patient with an emergency medical condition has been stabilized such that, within a reasonable degree of medical certainty, no material deterioration of this patient's emergency medical condition is likely to result from or occur during transfer.

☐ C. This patient's emergency medical condition has not been stabilized and the patient is being transferred.

Based on the expected benefits of _Delivery on C-section of Premature Fetus 34 week_
and foreseeable risks of _More Bleeding  Painful contractions_
to this patient, and based upon the information available to me at the time of this patient's transfer, I believe the medical benefits reasonably expected from the provision of appropriate medical treatment at another facility outweigh the increased risks to the patient's (and/or fetus') medical condition from effecting transfer.

The receiving physician _DR FEGEN_ _____ was contracted at (time) _2/45_
on (date) _02/11/04_ _____ and accepts the patient at the receiving facility.

_James O. Steele_ _____ _James O Steele_ _____ _2/11/04_ _2/41—_
PRINT NAME OF CERTIFYING PHYSICIAN      SIGNATURE OF PHYSICIAN CERTIFYING TRANSFER      DATE      TIME am/pm

### Section II:

A. The receiving facility _Sioux Valley_ _____, has available space and qualified personnel for the treatment of this patient, and has agreed to accept transfer and to provide appropriate medical treatment. Nursing contact at receiving facility: _____

   Contact by: _____, at (time) _____ on (date) _____

B. The receiving facility was provided a copy of all appropriate medical records of the examination and treatment of this patient:
   - ☐ Emergency Department Record
   - ☐ Laboratory Tests
   - ☐ X-Ray Films
   - ☐ EKG
   - ☐ Nurses Notes
   - ☐ Patient Transfer Form
   - ☐ Progress Notes, Orders
   - ☐ Permanent Hospital Record
   - ☐ Other _____

C. Mode of Transfer: (Check One)
   - ☐ Private Vehicle
   - ☐ Basic Ambulance
   - ☒ Paramedic Ambulance
   - ☐ Helicopter/Fixed Wing

D. Patient consent:
   1. I, _____, ☐ request or ☐ consent to transfer, and have been informed of the benefits and risks involved in transfer listed above.
      Signature _____ Witness _____ Date _____ Time _____

   2. I, _____, the legally responsible person acting on behalf of _____, ☐ request or ☐ consent to transfer, and have been informed of the benefits and risks involved in transfer listed above.
      Signature _____ Witness _G R Miller_ _____ Date _2/13/04_ Time _2210_

10/03

**LAKES REGIONAL HEALTHCARE**
**SPIRIT LAKE, IOWA**

HEIMLICHER, LAURA   F
[illegible]   SPIRIT LAKE
[illegible]   TOWN   12/01/1970
[illegible] STEELE, JAMES D   MR 102675

## *CONSENT FOR TRANSFER*

| **Section I:** (To be completed by physician) |
|---|

☐ A. This patient has been examined and does not suffer from an emergency medical condition nor is in labor and can be transferred without any expected deterioration in condition.

☑ B. This patient with an emergency medical condition has been stabilized such that, within a reasonable degree of medical certainty, no material deterioration of this patient's emergency medical condition is likely to result from or occur during transfer.

☐ C. This patient's emergency medical condition has not been stabilized and the patient is being transferred.

Based on the expected benefits of _DELIVERY OF C-SECTION of PREMATURE FETUS 34 wrl_
and foreseeable risks of _MORE BLEEDING   PAINFUL CONTRACTION_
to this patient, and based upon the information available to me at the time of this patient's transfer, I believe the medical benefits reasonably expected from the provision of appropriate medical treatment at another facility outweigh the increased risks to the patient's (and/or fetus') medical condition from effecting transfer.

The receiving physician _DA FIEGEN_ was contracted at (time) _2145_
on (date) _02/11/04_, and accepts the patient at the receiving facility.

_James D. Steele_     _[signature]_     _2/11/04_     _2141—_
PRINT NAME OF CERTIFYING PHYSICIAN     SIGNATURE OF PHYSICIAN CERTIFYING TRANSFER     DATE     TIME am/pm

| **Section II:** |
|---|

A. The receiving facility _Sioux Valley_, has available space and qualified personnel for the treatment of this patient, and has agreed to accept transfer and to provide appropriate medical treatment.
Nursing contact at receiving facility: _Sioux Valley ER_
Contact by: _Jennifer Heile RN_, at (time) _2110_ on (date) _2-11-04_

B. The receiving facility was provided a copy of all appropriate medical records of the examination and treatment of this patient:
☒ Emergency Department Record    ☒ Nurses Notes
☐ Laboratory Tests    ☒ Patient Transfer Form
☐ X-Ray Films    ☒ Progress Notes, Orders
☐ EKG    ☐ Permanent Hospital Record
   ☐ Other _____

C. Mode of Transfer: (Check One)
☐ Private Vehicle    ☐ Basic Ambulance    ☒ Paramedic Ambulance    ☐ Helicopter/Fixed Wing

D. Patient consent:
1. I, _Laura Heimlicher_, ☐ request or ☒ consent to transfer, and have been informed of the benefits and risks involved in transfer listed above.

_____ Signature    Witness _____ Date_____ Time_____

2. I, _____, the legally responsible person acting on behalf of _____, ☐ request or ☐ consent to transfer, and have been informed of the benefits and risks involved in transfer listed above.

_[signature]_ Signature    Witness _[signature]_ Date _2/3/04_ Time _2210_   **15**

10/00    LAKES PRINTING COMPANY INC. Spirit Lake, IA

## INSTRUCTION NO.  13
## NEGLIGENCE – DUTY OF CARE

For a physician, "negligence" means the failure to use the degree of skill, care, and learning ordinarily possessed and exercised by other physicians in similar circumstances. The locality of practice in question is one circumstance to take into consideration but is not an absolute limit upon the skill required.

A physician's conduct must be viewed in light of the circumstances existing at the time of diagnosis and treatment, and not retrospectively.  If a physician exercised a reasonable degree of care and skill under the circumstances as they existed, though not as seen in perfect hindsight, then the physician is not negligent.

For a hospital, negligence means the failure to use the degree of skill, care, and learning ordinarily possessed and exercised by other hospitals in similar circumstances.

## INSTRUCTION NO. 15

## CLAIM AGAINST DR. STEELE FOR LOSS OF PARENTAL CONSORTIUM

For a plaintiff to recover on his or her claim against James O. Steele, M.D., for loss of parental consortium, the plaintiff must prove all of the following propositions:

1.  Dr. Steele was negligent in one or more of the following ways:

    a.  failing to recognize Ms. Heimlicher's need for an emergency delivery;

    b.  transferring Ms. Heimlicher to Sioux Valley Hospital without first determining that her medical condition and the medical condition of the unborn child were not likely to materially deteriorate during the transfer.

2.  Dr. Steele's negligence was a proximate cause of the still birth of the child and of the plaintiff's damages.

3.  The amount of the plaintiff's damages.

If a plaintiff has proved all of these propositions with respect to Dr. Steele, then that plaintiff is entitled to recover damages from Dr. Steele in some amount. If a plaintiff has failed to prove any of these propositions, then that plaintiff is not entitled to recover damages from Dr. Steele.

# INSTRUCTION NO. 16

## CLAIM AGAINST HOSPITAL FOR LOSS OF PARENTAL CONSORTIUM

For a plaintiff to recover on his or her claim against Dickinson County Memorial Hospital for loss of parental consortium, the plaintiff must prove all of the following propositions:

1.     The hospital was negligent in one or more of the following ways:

     a.     failing to recognize Ms. Heimlicher's need for an emergency delivery;

     b.     transferring Ms. Heimlicher to Sioux Valley Hospital without first determining that her medical condition and the medical condition of the unborn child were not likely to materially deteriorate during the transfer.

2.     The hospital's negligence was a proximate cause of the still birth of the child and of the plaintiff's damages.

3.     The amount of the plaintiff's damages.

If a plaintiff has proved all of these propositions with respect to the hospital, then that plaintiff is entitled to recover damages from the hospital in some amount. If a plaintiff has failed to prove any of these propositions, then that plaintiff is not entitled to recover damages from the hospital on this claim.

## INSTRUCTION NO.  17
## LIABILITY OF HOSPITAL CORPORATION

Dickinson County Memorial Hospital is a corporation.  Although a corporation often is treated under the law as if it were a person, a corporation can act only through its employees, officers, directors, and agents.  Therefore, a corporation is held responsible under the law for the acts or omissions of its employees, officers, directors, and agents performed within the scope of their authority.

Employees, officers, directors, and agents of a corporation are acting "within the scope of their authority" only when they are engaged in the performance of duties expressly or impliedly assigned to them by the corporation.  Unless you are instructed otherwise, a corporation is not responsible for the acts or omissions of its employees, officers, directors, or agents performed outside the scope of their authority.

Generally, a doctor or other health care provider who is not employed by a hospital is not an agent of the hospital, even if the doctor or the other health care provider uses the facilities of the hospital.  However, a hospital emergency room patient ordinarily looks to the hospital for care, and not to the individual physician or other health care provider, and accepts the care provided by the physician or health care provider assigned to her case. A hospital is liable for the actions of a non-employee physician or other health care provider providing services to a hospital emergency room patient when all of the following is proven:

1.      The hospital, by its actions, holds out the physician or other health care provider as its agent or employee;

2.      The patient looks to the hospital for care, and not to the individual physician or other health care provider;

3.      The patient has no control over the assignment of the physician or other health care provider to provide treatment or services to her;

4.      The patient receives treatment or services from the physician or other health care provider in the reasonable belief that the treatment or services are being rendered on behalf of the hospital; and

5.      The patient accepts the treatment or services in reliance on the belief that the treatment or services are being rendered on behalf of the hospital.

# INSTRUCTION NO.  18

## THE EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT

The plaintiffs allege a claim against Dickinson County Memorial Hospital pursuant to the Emergency Medical Treatment and Active Labor Act, a federal law known as "EMTALA."

Under EMTALA, if an individual comes to a hospital's emergency department and requests examination or treatment, then the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department to determine whether or not the individual is suffering from an emergency medical condition.  In the case of a pregnant woman, the term "emergency medical condition" includes:

1.  a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the woman or her unborn child in serious jeopardy; and

2.  when there is inadequate time to effect a safe transfer of the woman to another hospital before delivery or when the transfer may pose a threat to the health or safety of the woman or the unborn child.

If a pregnant woman suffering from an emergency medical condition comes to a hospital, then the hospital must provide necessary treatment to "stabilize" the woman. With respect to paragraph (1), above, the term "stabilize" means to provide such medical treatment as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from, or occur during, the transfer.  With respect to paragraph (2), above, the term "stabilize" means to wait until the woman has delivered the child.  A hospital cannot transfer a pregnant woman who is having contractions to another hospital if there is not enough time for her to be transferred

safely before delivery, or if the transfer could pose a threat to the health or safety of the woman or the unborn child.

A hospital may transfer a pregnant woman suffering from an emergency medical condition even if her condition has not been stabilized if a physician signs a certification that the medical benefits reasonably expected from the transfer outweigh the increased risks from the transfer to the woman and the unborn child. Before signing such a certification, the physician has a duty to deliberate and weigh the medical risks and benefits of the transfer.

# INSTRUCTION NO. 19

## CLAIM AGAINST HOSPITAL UNDER EMTALA

For a plaintiff to recover on his or her EMTALA claim against Dickinson County Memorial Hospital, the plaintiffs must prove all of the following propositions:

1.      Ms. Heimlicher came to Dickinson County Memorial Hospital on the evening of February 11, 2004, suffering from an emergency medical condition.

2.      The hospital knew Ms. Heimlicher was suffering from an emergency medical condition.

3.      The hospital transferred Ms. Heimlicher to Sioux Valley Hospital without first making a reasonable determination that her emergency medical condition had stabilized.

4.      The transfer of Ms. Heimlicher to Sioux Valley Hospital was a proximate cause of the plaintiff's damages.

5.      The amount of the plaintiff's damages.

If a plaintiff has proved all of these propositions, then that plaintiff is entitled to recover damages on his or her EMTALA claim against the hospital, unless the hospital proves its "certification" defense, as described in Instruction No. 20. If a plaintiff has failed to prove any of these propositions, then that plaintiff is not entitled to recover on his or her EMTALA claim against the hospital.

# INSTRUCTION NO. 20

## CERTIFICATION DEFENSE

To prove its "certification" defense under EMTALA claim, Dickinson County Memorial Hospital must prove both of the following propositions:

1.      A physician who was acting as an agent or employee of the hospital signed a certification that the medical benefits reasonably expected from the transfer of Ms. Heimlicher from Dickinson County Memorial Hospital to Sioux Valley Hospital in Sioux Falls, South Dakota, outweighed the increased risks from the transfer to her and the unborn child; and

2.      Before signing the certification, the physician deliberated and weighed the medical risks and benefits of the transfer, and made a reasonable determination, based on the information available to him at that time, that the medical benefits reasonably expected from the transfer outweighed the increased risks from the transfer to Ms. Heimlicher and the unborn child.

If the hospital has proved both of these propositions, then the plaintiffs are not entitled to recover on their EMTALA claim against the hospital.

# INSTRUCTION NO. 22

## DAMAGES

If you find a plaintiff is entitled to recover damages, it is your duty to determine the amount. In doing so, you must consider only the following items:

a. The reasonable value to the plaintiff of future loss of services of the child, from the present time until the child would have reached the age of eighteen years.

> Loss of services includes both the amount the child would have earned and the economic or financial value of the child's labor at home.

b. The reasonable value to the plaintiff of past loss of companionship and society of the child, from the date of death to the present time.

c. The reasonable value to the plaintiff of future loss of companionship and society of the child, from the present time until the child would have reached the age of eighteen years.

d. The past probable and reasonable expense to the plaintiff of the child's board and maintenance, from the date of death to the present time.

e. The future probable and reasonable expense to the plaintiff of the child's board and maintenance, from the present time until the child would have reached the age of eighteen years.

Damages for future loss of services (item "a," above) are to be reduced to their present value. For this purpose, "present value" is the sum of money received now that, together with interest earned on the money in the future at a reasonable rate of return, would equal the present total of all of the future receipts. Future expense for board and maintenance (item "e," above) also are to be reduced to present value. For this purpose, "present value" is the sum of money received now that, together with interest earned on the money in the future at a reasonable rate of return, would equal the present total of all

of the future expenses. Damages for companionship and society are not to be reduced to present value.

If you award damages to one of the plaintiffs and reduce those damages by expenses of the child's board and maintenance, you are not to reduce any damages you award to the other plaintiff by those same expenses. In other words, you are not to "double count" the expenses of the child's board and maintenance.

The plaintiffs are not entitled to recover damages for pain, suffering, grief, or mental anguish from the loss of the child. They also are not entitled to recover damages for the delivery or for recuperation following delivery.

The amount you assess for loss of services, companionship, and society in the past and future cannot be measured by any exact or mathematical standard. You must use your sound judgment based upon an impartial consideration of the evidence. Your judgment must not be exercised arbitrarily, or out of sympathy or prejudice for or against the parties. The amount you assess for any item of damages must not exceed the amount caused by the defendants as proved by the evidence.